705 F.2d 265
 10 Ed. Law Rep. 947
 Delores CLARK, Roosevelt Clark, June Clark, Sharon Clark,
infants, by their father and next friend, Roosevelt Clark
and Ethel Lamar Moore, an infant, by her mother and next
friend, Mrs. Dazzle Mott Moore, Appellants,
v.
The BOARD OF EDUCATION OF the LITTLE ROCK SCHOOL DISTRICT,
Russell Matson, Jr., President; Everett Tucker, Jr., W.T.
McDonald, John Harrell, Warren K. Bass and James Coates,
Directors of the Little Rock School District, Appellees.
 No. 82-1834.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1983.
Decided March 31, 1983.
 
 Friday, Eldredge & Clark by Christopher Heller, Little Rock, Ark., for appellee Bd. of Educ. of Little Rock School Dist.
 John W. Walker, Ralph Washington, Little Rock, Ark., Jack Greenberg, James M. Nabrit, III, Bill Lann Lee, Theodore M. Shaw, New York City, W.A. Branton, Jr., Washington, D.C., for appellants.
 Before HEANEY, BRIGHT and ARNOLD, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The process of desegregation in the Little Rock, Arkansas, school district has been a long and difficult one.[1] We are presently concerned with the constitutionality of a plan adopted by the School Board for the elementary grades, the "Partial K-6 Plan." The district court,[2] determined that the changes proposed by the School Board in the Partial K-6 Plan were constitutional. We cannot say that the district court clearly erred in this holding and, accordingly, we affirm.
 
 
 2
 This lawsuit was originally commenced by plaintiffs to dismantle the dual system of public education that existed in the public schools of Little Rock, Arkansas. In 1971, this Court approved a plan for the desegregation of grades 6 through 12 and directed the School Board to implement a plan to integrate the elementary grades. Clark v. Board of Education of the Little Rock School District, 449 F.2d 493, 495, 498-499 (8th Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1971). In 1972, we approved the plan that was developed for grades 4 and 5, but rejected one devised for grades 1 through 3. Clark v. Board of Education of the Little Rock School District, 465 F.2d 1044, 1046 (8th Cir.1972), cert. denied, 413 U.S. 923, 93 S.Ct. 3054, 37 L.Ed.2d 1044 (1973). We did so because we believed that the plan for grades 1 through 3 was "a last ditch effort to retain a segregated school system in the primary grades contrary to the Supreme Court's mandate that segregation be eliminated 'root and branch.' " Id. at 1047 (citing Green v. County School Board of New Kent County, 391 U.S. 430, 437-438, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968)). We ordered that the School Board develop a plan for grades 1 through 3 in eastern Little Rock for the 1973-1974 school year similar to that adopted for grades 4 and 5.
 
 
 3
 In June, 1973, the parties executed a "moratorium agreement" concerning student assignments in the primary grades, which was approved by the district court and implemented during the 1973-1974 school year. In addition to pupil assignments, the agreement established a goal of one-third black/two-thirds white personnel in administrative and teaching positions, prohibited "tracking" while allowing the use of "achievement grouping" within the framework of "presently heterogeneous student groupings," and established a Biracial Committee, composed of an equal number of black and white persons, to aid in the resolution of any problems that might occur. The agreement also provided that the plaintiffs would refrain from instituting further legal proceedings for at least two years in order to allow the School Board time to implement desegregation in an atmosphere free from litigation.
 
 
 4
 When the agreement was implemented in the fall of 1973, the Little Rock public schools served a total of 21,095 students, 48% of whom were black. Black students accounted for from 41% to 77% of the students in the elementary grades,[3] from 44% to 58% in the middle schools, grades 6 and 7, and from 39% to 56% of the students in the junior and senior high schools. By the fall of 1976, black enrollment in the public schools had increased to 54%. Percentages of black students in the junior and senior high schools ranged from 39% to 56%; in the middle schools, from 44% to 60%; and in the elementary schools, from 31% to 90%. The number of classes at the elementary level that had racial compositions which varied more than 10% from the racial composition of those grades district-wide had increased from previous years, and increased again in 1977.
 
 
 5
 The school district implemented a reorganization plan in the fall of 1978 to correct some of the imbalances that existed, particularly in the elementary grades. Under this plan, the 3-2-2-2-3 grouping of grades was changed to a 3-3-3-3 grouping. Thus, commencing with the 1978-1979 school year, the district had primary (grades 1-3), intermediate (grades 4-6), junior high (grades 7-9), and senior high (grades 10-12) schools. As a result of the reorganization, the racial composition of all of these grades remained approximately within 10% of the district-wide racial composition from 1979 through 1981.
 
 
 6
 By the fall of 1981, there were only 18,104 students in the Little Rock school system, and the percentage of black students had increased to 65%. The 1981-1982 racial composition at each of the schools once again varied from the district-wide percentages. Seventy-six percent of the students in the elementary grades were black and the percentage of black students ranged from 65% at Terry to 86% at Williams. At four elementary schools, the percentage of nonwhite students was 80% or greater. In the intermediate grades, black children accounted for an average of 69% of the students, and individual schools ranged from 59% to 81% black. Two intermediate schools were 80% black or greater. At the junior high level, 62% of the children were black, and individual schools ranged from 49% to 69% black. Finally, the high schools ranged 51% to 57% black, when the percentage of black students at the high school level in the district was 55%.
 
 
 7
 The district court found that the decline in the percentage of white students enrolled in the Little Rock public schools could generally be explained by the movement of white families from the district to the suburbs, some of them to avoid sending their children to integrated schools, and by an increase in the black population in the school district, caused in part by a higher birth rate in the black population.
 
 
 8
 Until 1961, the boundaries of the Little Rock school district extended beyond the boundaries of the city of Little Rock. Since that date, the city has annexed additional land and has expanded to nearly eighty-two square miles. Meanwhile, the school district's boundaries have not been broadened, in part because annexation and consolidation require the joint agreement of the districts involved, and the Pulaski County Special School District has refused to cooperate in any efforts to merge or consolidate. Forty percent of the city is now outside the boundaries of the school district.
 
 
 9
 The school district was aware of the trends in enrollment described above for some time. In a 1980 report entitled " 'White Flight'--A Planned Response," Superintendent Paul Masem reviewed the attendance statistics and concluded that "Little Rock is fast developing into a black school district." Masem's report continued:
 
 
 10
 As resegregation has become more evident, it has been accompanied by a shrinkage in the belief in the capacity of the Little Rock School District to provide equal educational opportunities to all students. Realities which support this assessment are as follows:
 
 
 11
 (1) the patterns of pupil assignment to academic offerings; (2) the disparity in performance between black and white students; (3) the racial composition of students who participate in co-curricular activities; (4) the visibility and recognition of all students in athletics; (5) the patterns of social interaction among students; (6) the patterns of social/professional interactions among staff; and (7) the persistent rate of "white flight" from the Little Rock School District and the central city. [Emphasis in original.]
 
 
 12
 The school district has attempted to keep as many white students in the public schools as possible through the implementation of several policy and program initiatives in addition to a variety of outreach and community relations programs. Faced with a continuing trend toward an all-black school district despite these efforts, Superintendent Masem recommended in December, 1980, that the School Board study alternative concepts for the reorganization of the school district. The School Board created a Patrons Reorganization Committee[4] to review the concepts proposed by the administration. The Biracial Committee was also involved in the study of various alternatives and the school district administration created a task force to aid in the effort.
 
 
 13
 Although no consensus had emerged on the appropriate steps that might be taken by the district, in August, 1981, the Board adopted a "65-35" reorganization plan. This plan required that white students in the primary grades (grades 1 to 3) be assigned to homeroom classes with other whites until the percentage of whites reached 35% in each class. Superintendent Masem was strongly opposed to the plan, which he estimated would create seventy-nine totally segregated classrooms. After a hearing in September, the district court held that the 65-35 plan was unconstitutional, and later characterized it as "a hurriedly conceived stopgap measure to appease white parents of primary children."
 
 
 14
 In December, 1981, the Board received a report on the progress of desegregation in Little Rock, which was submitted by the Desegregation Assistance Team of Stephen F. Austin State University. After a review of information provided by the district and after several days in Little Rock observing schools and interviewing community leaders, parents, and school personnel, the Team made several recommendations concerning adjustments in the desegregation plan and improvements in the quality of education offered by the Little Rock schools. Specifically, the Team recommended:
 
 
 15
 1) Creation of a small number of magnet schools, designed to guarantee substantial integration and important new educational choices
 
 
 16
 2) Ending mandatory busing of black students to schools or classes that have become virtually all-black
 
 
 17
 3) Creation of a permissive transfer program that would permit students in schools or grades that are virtually all of one race to transfer to a more integrated school
 
 
 18
 4) Strengthening school district public relations efforts and relationship with the housing market.
 
 
 19
 Many of the Team's recommendations concerning the quality of education were directed towards reducing the disparity between the achievement of black and white students. To this end, the Team advised that the school district should (1) continue and improve the reading program developed by the district; (2) use multicultural reading materials for all students; (3) study the effectiveness of the mathematics program and the design of a program to reduce the disproportionate achievement of white and black students; (4) perform a similar study of writing and speaking skills; (5) develop a plan for the inclusion of computer literacy; and (6) implement a skills-based teacher in-service training program that focuses on interpersonal and classroom management skills. The Team also made recommendations concerning career and vocational education, the counseling and guidance program, and the management and supervision of staff.
 
 
 20
 The School Board had established a January, 1982, deadline for receiving recommendations from the Biracial and Patrons Committees on the reorganization plan that should be implemented. Neither committee was satisfied with any of the plans or concepts that they had studied, however, so the Board decided to adopt criteria to guide the further consideration of the reorganization process. These criteria included a K through 6 orientation--whereby students would attend the same school for all of these years rather than the K, 1-3, 4-6 groupings that had been used by the district--a neighborhood school orientation, a reduction in the amount of busing, and a reduction in the number of school opening times.
 
 
 21
 Based upon these criteria, the administration developed five plans which the Board then reduced to three. These three plans were entitled Neighborhood Magnet, Partial K-6 with Magnets, and Partial K-6.[5] The three plans were reviewed by the Biracial Committee and the Patrons Committee, with the assistance of the administration's task force. Because the administration had recommended that the School Board not reorganize the district, it was not asked for a recommendation on the three plans under consideration. The administration did, however, make various recommendations concerning the impact of the adoption of each plan. After reviewing all three plans, the Patrons Committee did not make a recommendation, but the Biracial Committee agreed that the Partial K-6 Plan was the most acceptable of the three submitted.
 
 
 22
 On April 26, 1982, the Board adopted the Partial K-6 Plan with two modifications: (1) the creation of a magnet school west of University Avenue and (2) the requirement that a committee be appointed to ensure that the four essentially all-black schools would be treated equally. Several other modifications were subsequently made at a meeting held May 24, 1982. As adopted by the Board, the Partial K-6 Plan established nine neighborhood schools and seventeen paired schools. Bus routes were reduced from 104 to 72, and two schools--Jefferson and King--were closed. Booker School was converted from a junior high school to an intermediate school. The senior high schools were not affected by the plan.
 
 
 23
 The School Board later chose Williams as the magnet school. The program developed for the magnet emphasized basic skills, and any student in grades 1 through 6 who resided in the district could apply to attend. A maximum of 500 students were to be initially selected to achieve a 50% white/50% nonwhite racial composition, allowing for a 10% deviation.[6] Additional funds--10% over the average per pupil expenditure for other schools in the Little Rock School District--were appropriated for the development of the magnet school program.
 
 
 24
 In substance, the Partial K-6 Plan significantly increased the black enrollment of four elementary schools in black neighborhoods--Carver, Ish, Mitchell, and Rightsell--to the point that these schools for all practical purposes would be all-black. At the same time, it reduced the black population in five schools located in white or integrated neighborhoods and in one school located in a black neighborhood.[7] Thus, the percentage of black students at Jefferson was reduced from 73% to a projected 59% black, McDermott was reduced from 81% to a projected 68% black, Western Hills was reduced from 77% to a projected 52% black, Wilson was reduced from 78% to a projected 56% black, Gibbs was reduced from 83% to a projected 67% black, and Williams, the magnet school, was reduced from 81% to a projected 50% black. The theory behind the adopted plan was that by making these changes in enrollment patterns, integrated schools could be preserved at least for a time in the six schools listed and in a number of other schools in which smaller adjustments were made.
 
 
 25
 In its report on the effect of the Partial K-6 Plan, the administration informed the Board that space would be a potential problem in seven schools as a result of special education and Title I[8] needs. Three of these schools were those in which projected enrollments were over 96% black--Ish, Carver and Mitchell. The administration also advised the School Board to consider the problem of disproportionate resources being invested by local PTA and parent committees. School officials warned that significant differences in parental income and/or support could jeopardize the goal of providing equal educational opportunities. The only official action taken by the Board in this regard, however, was the appointment of a committee to monitor conditions at the all-black schools.
 
 
 26
 The Partial K-6 Plan as adopted by the School Board was submitted to the district court for approval. A hearing was conducted on June 7-8, 1982, after which the district court ruled that "[u]nder the circumstances of this case, Partial K-6 Plan is a constitutionally sound plan which may be implemented by the Little Rock School District." The plaintiffs appealed to this Court, requesting a stay pending their appeal. On August 16, 1982, this Court denied their motion for a stay, and we directed that the Board consider
 
 
 27
 (a) the establishment at an early date of a second magnet school to be located in the eastern section of Little Rock;
 
 
 28
 (b) means of enriching the educational opportunities of students attending the 4 virtually one-race elementary schools;
 
 
 29
 (c) the possibility of establishing a voluntary integration program with adjoining school districts;
 
 
 30
 (d) other means of providing opportunities for integration for students attending the 4 virtually one-race school[s].
 
 
 31
 Clark v. Board of Education of the Little Rock School District, No. 82-1834, slip op. at 2 (8th Cir. Aug. 16, 1982).
 
 
 32
 The plaintiffs' primary allegation on appeal is that the Partial K-6 Plan is unconstitutional because it resegregates four elementary schools and therefore is not consistent with the School Board's obligation to dismantle the dual school system in Little Rock. See Columbus Board of Education v. Penick, 443 U.S. 449, 459-460, 99 S.Ct. 2941, 2947-48, 61 L.Ed.2d 666 (1979); Clark v. Board of Education of the Little Rock School District, supra, 465 F.2d at 1045. The School Board argues that the district court's ruling should be upheld because there is no evidence that the Board intended to discriminate against blacks when it adopted the Partial K-6 Plan. See Dayton Board of Education v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977).
 
 
 33
 The school district has not demonstrated that it has achieved full integration in faculty, staff, student bodies, facilities, transportation and extra-curricular activities, see Green v. County School Board of New Kent County, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692-93, 20 L.Ed.2d 716 (1968); United States v. Texas Education Agency, 647 F.2d 504, 507-508 (5th Cir.), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1981), and school district officials testified that vestiges of discrimination remain in the school system.[9] This fact, however, does not necessarily preclude the alteration of the desegregation plan approved by the district court in 1973. It rather requires that the School Board show that the proposed changes are consistent with its affirmative duty to eliminate discrimination. Columbus Board of Education v. Penick, supra, 443 U.S. at 458-463, 99 S.Ct. at 2946-2949.
 
 
 34
 The School Board has a "heavy burden" of showing that its adoption of the Partial K-6 Plan does not "serve to perpetuate or re-establish the dual school system." Dayton Board of Education v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (citations omitted). While "[t]he measure of any desegregation plan is its effectiveness," Davis v. Board of School Commissioners, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), the constitutionality of any proposed plan "must be assessed in light of the circumstances present and options available in each instance." Green v. County School Board of New Kent County, supra, 391 U.S. at 439, 88 S.Ct. at 1695. Although the possibility of white flight and consequent resegregation cannot justify a school board's failure to comply with a court order to end segregation, see, e.g., Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968), it may be taken into account in an attempt to promote integration. See Johnson v. Board of Education, 604 F.2d 504, 516-517 (7th Cir.1979); Parent Ass'n of Andrew Jackson High School v. Ambach, 598 F.2d 705, 719 (2d Cir.1979).
 
 
 35
 When the Little Rock School Board decided that reorganization was needed, the school district faced a number of difficult problems. Superintendent Masem had informed the Board that if the demographic shifts and white flight continued, the school district would have an all-black enrollment within the next few years. The report by the Desegregation Assistance Team from Austin State University confirmed this fact. Black students were being bused to schools in which they attended virtually all-black classes. Financial support for the schools was eroding, and the public's confidence in the ability of the public school system to provide quality education was decreasing.
 
 
 36
 In an attempt to deal effectively with these problems, the School Board adopted the Partial K-6 Plan, after several alternatives were studied by two committees and the school district administration's task force. The plan as adopted represented the Board's attempt to temporarily reorganize attendance patterns while the School Board pursued longer-range plans to ensure an integrated school system.[10]
 
 
 37
 By adopting the Partial K-6 Plan, the School Board did create four virtually all-black schools with the result that approximately 19% of all nonwhite students in the elementary schools will be attending racially identifiable schools. But all white students will be attending fully integrated schools, and all children attending the racially identifiable schools will have the option of transferring to an integrated school, with transportation provided by the school district. The Partial K-6 Plan also creates a magnet school, which offers an alternative, integrated educational opportunity for elementary students in the school district, and provides for five stable, integrated neighborhood schools. Most importantly, the school district has stated its commitment to providing equal educational opportunities to the students attending the segregated schools, and has provided for a monitoring process to ensure that equality is actually maintained.[11]
 
 
 38
 Under all of these circumstances, we cannot say that the district court clearly erred in holding that the Partial K-6 Plan is constitutional. The creation of four all-black schools in and of itself is not a constitutional violation. Adams v. United States, 620 F.2d 1277, 1296 (8th Cir.), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); Lee v. Macon County Board of Education, 616 F.2d 805, 809 (5th Cir.1980); Armstrong v. Board of School Directors, 616 F.2d 305, 321-322 (7th Cir.1980). In so holding, however, we emphasize the importance of the School Board's commitment to ensuring that equal educational opportunity is provided to all students within the Little Rock school system. Our reading of the record suggests that the School Board consider the following implementing actions:
 
 
 39
 (1) The establishment at an early date of a second magnet school to be located in the eastern section of Little Rock. Adams v. United States, supra, 620 F.2d at 1297.
 
 
 40
 (2) The establishment of a comprehensive program of exchanging and transferring students with adjoining school districts. Although the district's past efforts to reach a voluntary agreement with the other two school districts in Pulaski County have not been successful, further attempts to achieve this goal should be made.[12] Adams v. United States, supra, 620 F.2d at 1296.
 
 
 41
 (3) The implementation of the recommendations made by the Austin Desegregation Assistance Team, see, supra, at 268, and by the school district administration to make sure that black students have equal educational opportunities.[13] See Milliken v. Bradley, 433 U.S. 267, 287-288, 97 S.Ct. 2749, 2760-61, 53 L.Ed.2d 745 (1977); Adams v. United States, supra, 620 F.2d at 1296; Parent Ass'n of Andrew Jackson High School v. Ambach, supra, 598 F.2d at 712 n. 3; Evans v. Buchanan, 582 F.2d 750, 767-769 (3d Cir.1978). In this regard, we note that the School Board has previously taken a number of actions designed to keep high-achieving white students in the school system.
 
 
 42
 (4) The implementation of a plan to provide integrated learning experiences for the students attending the four virtually all-black schools. Adams v. United States, supra, 620 F.2d at 1296.
 
 
 43
 Finally, the district court is to retain jurisdiction of this case to monitor the implementation of the Partial K-6 Plan and the School Board's progress in achieving the goals outlined above. Reports such as those suggested by the administration[14] that provide a detailed evaluation of equality throughout the school system should be filed with the court on a periodic basis. Cf. Pate v. Dade County School Board, 588 F.2d 501, 504 (5th Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979) (absent finding of unitary system, district court "has a continuing responsibility to appraise the system in light of actual conditions and experience and to make required changes").
 
 
 44
 Each party to this appeal will bear its own costs.
 
 
 45
 APPENDIX
 EFFECT OF PARTIAL K-6 PLAN
 --------------------------
 1982 Actual Projected*
 ----------- ---------
 School Capacity Total % Nonwhite Total % Nonwhite
-------------------------------------------------------------------------------
Balek 450 395 71% 387 72%
Brady 500 506 70% 404 67%
Fair Park 325 314 69% 305 70%
Forest Park 450 381 61% 324 64%
Fulbright 600 444 68% 524 70%
Jefferson 500 365 73% 407 59%
McDermott 575 494 81% 481 68%
Meadowcliff 500 412 66% 473 67%
Rominek 670 677 78% 650 71%
Terry 600 485 60% 583 63%
Western Hillsk 275 295 77% 301 52%
Wilsonk 500 468 78% 454 56%
Woodruff 325 296 77% 282 75%
Carverk 450 309 74% 508 99%
Franklin 570 478 69% 553 65%
Garland 475 524 82% 376 74%
Gibbs 445 385 83% 541 67%
Ishk 375 346 72% 362 99%
Mitchellk 300 258 79% 317 99%
Oakhurstk 395 355 72% 411 77%
Pulaski Heights 425 427 58% 450 66%
Rightsellk 350 300 80% 321 96%
Rockefeller 500 529 68% 411 66%
Stephens 400 408 64% 347 65%
Washington 375 353 68% 364 64%
Booker 600 469 66% 517 72%
Williamskk 335 81% 500 50%
*These data represent what the enrollments in the elementary schools would
have been if the Partial K-6 Plan as modified had been implemented during the
1981-19882 school year.
k Neighborhood School under Partial K-6 Plan.
k k Magnet School under Partial K-6 Plan.
 
 
 
 [1]
 See Clark v. Board of Education of the Little Rock School District, 465 F.2d 1044 (8th Cir.1972), cert. denied, 413 U.S. 923, 93 S.Ct. 3054, 37 L.Ed.2d 1044 (1973); Clark v. Board of Education of the Little Rock School District, 449 F.2d 493 (8th Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1971); Clark v. Board of Education of the Little Rock School District, 426 F.2d 1035, 1037 n. 1 (8th Cir.1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971) (citing previous history of this litigation)
 
 
 [2]
 The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas
 
 
 [3]
 The elementary grades referred to are grades 1 through 5. Kindergarten assignments are based upon neighborhood attendance patterns in Little Rock
 
 
 [4]
 The Committee was composed of ten white persons and ten black persons
 
 
 [5]
 A report prepared by the school district administration summarized each of the plans as follows:
 The Neighborhood Magnet will result in 26 neighborhood K-6 schools and two Individually Guided Education magnet schools, one at Pulaski Heights and one at Rockefeller. No schools would be closed under this plan, but Booker Junior High School would become a K-6 school. The K-6 neighborhood schools would retain the present educational program. [Twelve schools will have greater than 80% black enrollments.]
 The Partial K-6 with Magnets will provide 12 paired schools, eight K-6 schools which are racially balanced, four K-6 schools that are black, and two Individually Guided Education magnet schools, one at McDermott and one at Rockefeller. King and Williams schools would be closed, and Booker Junior High School would become a paired school. While the 12 paired schools and the 12 K-6 schools will retain the present educational programs, the IGE magnet schools will provide a new dimension to the total curriculum.
 The Partial K-6 Plan will retain the existing educational program in the 14 paired schools and will provide greater instructional flexibility in the 12 K-6 neighborhood schools by eliminating the organizational constraints in the existing K-3, 4-6 organization. King and Williams would be closed, and Booker Junior High School would become a paired school. [Four schools will have greater than 80% black enrollments.]
 
 
 [6]
 A magnet school is held out, in some respects, as being the best that the school district has to offer. There should be no implication, direct or indirect, that black students are not as welcome there as white students. In a district with a student body that is 65% black or more, an arbitrary limit of 50% on the black enrollment in a magnet school could send a message to the black students that they are somehow less desirable than whites. The District Court, as part of its continuing duty to oversee desegregation in the Little Rock School District, should be alert to guard against any such danger
 
 
 [7]
 The Appendix contains a detailed chart which outlines the effects of the adoption of the Partial K-6 Plan as projected by the administration. Although the hearing on this case before this Court occurred in January, no actual data was available concerning the effect of the adoption of the plan
 
 
 [8]
 Title I funds are used to provide assistance to meet the special needs of educationally deprived children. These funds are given to both public and private schools in Little Rock
 
 
 [9]
 For example, although the percentage of black teachers and administrators has exceeded the one-third goal established by the moratorium agreement in 1973, there have been no black secondary principals nor any black supervisors of academic instruction at the secondary level. Tr. at 110-112. In addition, federal funds were withheld in 1976 because over 1,000 black students were discriminatorily assigned to special education classes. Tr. at 322
 
 
 [10]
 The school district filed suit against the Pulaski County Special School District, the North Little Rock School District, the State of Arkansas, the State Board of Education, the Pulaski County Board of Education, and various other defendants on November 30, 1982. The complaint alleged the defendants were liable for the maintenance of a dual, racially segregated public school system in Pulaski County. As relief, the school district sought an order requiring the implementation of a plan to eliminate all remaining vestiges of discrimination in public education in Pulaski County, including
 the reorganization and/or consolidation of school districts; the establishment of magnet schools; the nondiscriminatory transportation of pupils; the desegregation of faculty and staff; procedures for nondiscrimination in classroom and program assignments and in discipline; compensatory programs to overcome the effects of past discrimination; and such other provisions and programs as are needed to eliminate the remaining vestiges of segregation in the schools in the county.
 Little Rock School District v. Pulaski County Special School District, No. LR-C-82-866 (E.D.Ark., filed Nov. 30, 1982). We, of course, intimate no view on the merits of this suit.
 
 
 [11]
 In November, 1982, the monitoring committee filed its first report on conditions in the four segregated schools. The committee made several positive comments concerning these schools: the principals were highly respected, the learning atmosphere was positive, and the teacher-pupil ratio and class size appeared to be similar to those in other Little Rock schools. Concerns were expressed, however, regarding the condition of the school facilities, the performance of students and the need for more individualized instruction, the lack of certain instructional materials, and the need for greater parent involvement. The finding by some monitoring committee members of low teacher expectations and/or achievement by the students at the four black schools is particularly troubling
 
 
 [12]
 In St. Louis, a tentative agreement in principle has been reached by the St. Louis city schools and the adjacent suburban schools and filed with the district court. See Report of the Special Master, Liddell v. Board of Education, No. 72-100C(4) (E.D.Mo., Feb. 22, 1983). Comments are now being received by the court. Under the terms of this agreement the suburban schools will accept the transfer of some black students from the city district. Additional magnet schools will be established, the quality of education in the city school system will be improved, and the quality of instruction for black students who attend racially identifiable schools will be improved. The State of Missouri will participate in the costs of implementing the interdistrict transfers and of improving the quality of education in the city schools
 
 
 [13]
 The school district administration recommended that the district strive to achieve the following characteristics in the four all-black schools: strong administrative leadership; a climate of expectation in which no child is permitted to fall below minimum standards; an environment that is orderly without being rigid, quiet without being oppressive; an emphasis on the acquisition of basic school skills over other school activities; the flexibility to divert school energy and resources from other business in furtherance of the fundamental objectives; and the existence of procedures to monitor frequently pupil progress
 
 
 [14]
 See Defendant's Exhibit 20, Special Needs of Segregated Schools, Recommendations One through Three and Additional Recommendations, pages 120-126