### LITTLE ROCK SCHOOL DISTRICT, Plaintiff,

v.

### PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, et al., Defendants,

**Mrs. Lorene Joshua, et al., Intervenors,**

**Katherine Knight, et al., Intervenors.**

No. LR–C–82–866.

United States District Court, E.D. Arkansas, W.D.

Dec. 11, 1989.

---

Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

Wright, Lindsey & Jennings, Little Rock, Ark., for Pulaski County Special School Dist., Mac Faulkner, Bob Moore, Don Hindman, Shirley Lowery, Sheryl Dunn, David Sain and Bob Stender.

Steve Clark, Arkansas Atty. Gen., H. William Allen and Sharon Streett, Dept. of Educ., Little Rock, Ark., for Arkansas State Bd. of Educ., Wayne Hartsfield, Walter Turnbow, Harry A. Haines, Jim Dupree, Dr. Harry P. McDonald, Robert L. Newton, Alice L. Preston, Jeff Starling, Earle Love and Bob Lyon.

Jack, Lyon & Jones, Little Rock, Ark., for North Little Rock School Dist., Bob Lyon, John Ward, Judy Wear, Leon Barnes, Marianna Gosser and Steve Morley.

Stephen L. Curry, Little Rock, Ark., for Grainger Williams, Richard A. Giddings, George A. McCrary, Buddy Raines and Dale Ward.

Norman Chachkin, NAACP Legal Defense Fund, New York City, and John Walker, Little Rock, Ark., for intervenors Joshua, et al.

Richard Roachell, Little Rock, Ark., for intervenors Knight, et al.

### ORDER

HENRY WOODS, District Judge.

The parties in this case have petitioned the court for approval of a financial settlement (settlement) between the defendant State of Arkansas and all other parties in the case. This latest proposed settlement was negotiated and submitted for approval *after* I had rejected the proposed settlement of student assignments, *after* I had found the school districts in default in their obligation to formulate a constitutional plan to restore the child victims of racial discrimination to the place they would have enjoyed absent illegal acts, and *after* I had appointed a Metropolitan Supervisor.[1]

The parties negotiated this settlement with full knowledge that the there was not a court-approved plan in place and that the final plan presented to this court will be presented by the court-appointed Metropolitan Supervisor. It is somewhat unusual to settle money matters before approval of a plan, but because the parties have bargained at arms length, because I believe settlement of money issues will speed the implementation of a workable plan under the guidance of the Metropolitan Supervisor, and because the money involved appears to be reasonable, though modest, I will accept the amount of financial settlement as full satisfaction of the State's liability in this matter, as recommended by the Special Master.[2]

### I. BACKGROUND

"Those who cannot remember the past are condemned to repeat it."[3] The liability of the State to her children in this county attaches, not because the State is a "deep pocket," but because of the intentional acts and omissions of publicly elected officials, acting on behalf of the people of Arkansas. Those intentional acts of racial discrimination are a matter of public record, and sadly, of national and international infamy.

The initial reaction of the school board of the Little Rock School District Board of Education to the landmark case, *Brown v. Board of Education* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was one of reason. Three days after the *Brown* decision, the following statement issued:

It is our responsibility to comply with Federal Constitutional Requirements and we intend to do so when the Supreme Court of the United States outlines the method to be followed.

---

1. Eugene Reville, an educator with experience in developing and implementing quality desegregation plans, was appointed to submit a workable student assignment plan by December 31, 1989. The interim plan, approved for the 1989–90 school year only, allowed a substantial deviation from guidelines set by the Court of Appeals for the Eighth Circuit. The temporary deviation was granted only to prevent disruption in student assignments pending the development of the long-term plan.

2. The Honorable Aubrey V. McCutcheon, Jr., a distinguished attorney, was appointed Special Master in this case in October 1987. Mr. McCutcheon represents several large city school districts with successful, education-oriented desegregation plans. He has special expertise in school finance, a particularly difficult area of school law.

3. Santayana, *The Life of Reason*, vol. I, *Reason in Common Sense*.

The reaction of State officials, notably then-governor Oval Faubus, when a desegregation plan was actually prepared is infamous:

> While the School Board was thus going forward with its preparation for desegregating the Little Rock school system, other state authorities, in contrast, were actively pursuing a program designed to perpetuate in Arkansas the system of racial segregation which this court has held violated the Fourteenth Amendment.

*Cooper v. Aaron*, 358 U.S. 1, 8, 78 S.Ct. 1401, 1405, 3 L.Ed.2d 5 (1958).

When LRSD admitted nine black students to Central High School in September, 1957, State officials, acting in their official capacities, led the opposition.

> [The plan to admit the nine black students met] with drastic opposing action on the part of the Governor of Arkansas who dispatched units of the Arkansas National Guard to the Central High School grounds and placed the school "off limits" to [black] students. As found by the District Court in subsequent proceedings, the Governor's participation had not been requested by the school authorities and was entirely unheralded.

*Id.* at 9, 78 S.Ct. at 1405.

In August, 1958, Governor Faubus called a special session of the legislature to meet in August of 1958. In that session, the legislature passed legislation: authorizing the governor, by proclamation, to close any or all public schools within any school district pending a referendum "for" or "against" the "racial integration of all schools within the school district"; and authorizing students to transfer to segregated schools *across district lines* if the schools they ordinarily attended were to be desegregated.

In an opinion rendered in September, 1958, the Supreme Court of the United States summed up the unconstitutional acts of officials of the State of Arkansas to that time:

> The legislative, executive, and judicial departments of the state government opposed the desegregation of Little Rock schools by enacting laws, calling out troops, making statements vilifying federal law and federal courts, and failing to utilize state law enforcement agencies and judicial processes to maintain public peace.

*Id.* at 15, 78 S.Ct. at 1408.

Three days after the Supreme Court's September, 1958, ruling in *Cooper v. Aaron*, Faubus, by gubernatorial proclamation, closed all four high schools in the Little Rock School district.

Unfortunately, into the 1960's, official State action fostered the ends of racial hatred and discrimination. For example, an Arkansas Real Estate Commission regulation provided that "a realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood." In one instance cited to this court, a realtor violated this regulation by selling a home to a black family in a residential area where no blacks lived and was advised by the Arkansas Real Estate Commission that his "misconduct" might prevent his licensure.

The systematic official policy of the State of Arkansas in those years, as acted out by her elected officials, of ensuring segregated housing and of vigorous resistance to the rule of law visited untold harm on all the citizens of this State. School children, black and white, were left to pay the price for the unconscionable manner in which politicos pandered to the basest of human emotions.

Repudiation of the philosophy and antics of the Faubus administration by current State officials cannot excuse the debt incurred. Rather, it requires both an acknowledgement of the debt owed and a commitment of the resources necessary to right the wrong.

The State's recognition of the devastating effects on its children of the intentional acts and omissions of prior leaders can be the end of what is, doubtlessly, the ugliest

era in this State's history, and the beginning of a new day.

## II. SETTLEMENT

When the Court of Appeals for the Eighth Circuit remanded the case for further hearings on financial liability of the State, I appointed a Special Master with expertise in school desegregation and school finance to recommend, *inter alia,* the State's financial obligation to the school children under the mandate from the Eighth Circuit. The Special Master conducted months of hearings where the parties litigated the State's financial liability for compensatory and remedial education necessitated by state-fostered segregation. The parties requested that the financial issues be litigated separately: (1) the State's reimbursement to LRSD for compensatory education provided from the time of the filing of the lawsuit in 1982 through the 1987–88 school year; (2) the State's obligation for compensatory and remedial education in LRSD for the 1988–89 "stabilizing year"; (3) the State's alleged miscalculation of aid to all three districts under the Minimum Foundation Program Aid (MFPA) formula; and (4) the State's obligation for the long-term plans the districts were in the process of developing.

Before the first settlement document was presented, the Special Master had recommended, and I had ordered, an adjustment and correction of the manner in which the State calculated the districts' MFPA, resolving one of the financial issues. Furthermore, the issue of payments due for the 1988–89 school year had also been fully litigated. The Special Master had agreed, at the parties' request, to hold his recommendation on that issue in abeyance pending the outcome of settlement negotiations. In short, the most time-consuming portion of the litigation of the State's financial liability had been completed before the parties reached a settlement. Nonetheless, a settlement of issues is preferred even when those issues have already been litigated.

## III. THE RECOMMENDATION OF THE SPECIAL MASTER

Special Master McCutcheon has recommended to the court that the amount of the settlement be approved. His recommendation was made after he presided over a two-day hearing to clarify and explain each provision of the settlement. Each party was asked, in that hearing, to specify which, if any, provisions of the proposed settlement agreement, if modified, would cause a withdrawal from the settlement. At the conclusion of the hearing, all such clauses necessary to the settlement had been identified by the parties.

The parties have filed objections to the Recommendations of the Special Master filed October 4, 1989. However, no party has contested the Findings of Fact. Accordingly, I hereby adopt the following Findings of Fact:

1. The parties have resolved all disputes relative to calculations of money to be paid by the State of Arkansas, to each school district under the terms of the settlement.

2. The parties, by their language in II. D. of the March 1989 submission, intend to limit the District Court's jurisdiction to require the use of traditional desegregative tools to remedy the effects of prior segregatory acts, by proscribing additional interdistrict magnet schools, additional spaces in existing magnet schools and expansion of magnet programs.

3. The parties believe that the use of Interdistrict Schools will be as successful in desegregating the three school districts as additional magnet schools would be.

4. The parties, by their settlement, have not contemplated the method by which major repair or replacement of magnet facilities would be financed.

5. The State has agreed to re-examine the methodology used by the Arkansas Department of Education to calculate the costs of Majority–to–Minority (M–to–M) transfers and to make any corrections required to comply with the August, 1986 Court-approved stipulation.

6. The parties intend to use the proceeds of the financial settlement to retire

deficits incurred in prior years whether or not those deficits are directly attributable to compliance with the desegregation orders of the Court.

7. Each of the parties acknowledges the obligation of each school district to comply with the Eighth Circuit mandate and the desegregation orders of the Court, notwithstanding the sufficiency or insufficiency of the state funds assured by the settlement agreement.

8. The parties have demonstrated reasonable diligence in seeking to avoid protracted and risky litigation over financial matters in favor of effecting expeditious resolution of fiscal conflicts.

9. The settlement agreement is not restricted to financial obligations, but includes monitoring and other obligations to be assumed by the State in an effort to ensure, *inter alia*, expenditure of the settlement funds in a manner best suited to achieve desegregated education for the benefit of all of the children in the three school districts.

10. The parties acknowledge that the language in the settlement agreement regarding the dismissal of the State should not be construed to limit the District Court's jurisdiction to enforce the settlement agreement or to find and remedy new violations.

In his Conclusions, the Special Master has recommended approval of all aspects of the amended settlement agreement except as follows:

1. Although the State's obligation to contribute to the funding of future interdistrict magnet schools shall be limited by the terms of the settlement agreement, there shall be no other limitation

on the Court's jurisdiction to order such schools and programs.

2. Except as to the State, the settlement agreement shall not be construed to impose any limitation upon the Court's jurisdiction to determine the allocation of costs for any repair or replacement of magnet school facilities.

3. Funds provided by the State under the terms of the settlement agreement may be used to retire prior years' deficits *only to the extent* such deficits accrued as a result of expenditures necessary to comply with the Eighth Circuit mandate and desegregation orders of the Court.

## IV. OBJECTIONS

The parties, in their Objections to the Master's Recommendations, object only to the conclusions reached by the Special Master.[4] The primary objection revolves around the theme that the settlement is a "bargained exchange between the litigants." (Joint Objection at pp. 2, 3, 4.) The parties contend that the court is obliged to accept each and every provision that the parties "bargained for," without comment, or reject the settlement.

■ At the time this financial settlement "bargain" was struck, this court had already rejected the proposed student assignment plans for PCSSD and LRSD.[5] Because of the apparent inability of the school districts to fashion a plan that would lead to constitutional school systems, this court had appointed a Metropolitan Supervisor to oversee the development and drafting of such a plan. The parties were free to "bargain" with each other concerning who was to pay how much, but at that juncture, the districts had defaulted on the right and obligation to dictate or bargain away particular remedies.[6] That the dis-

---

4. A document entitled "Joint Objections to Master's Recommended Changes in the Proposed Settlement Agreement, as Amended" was filed by the Joshua Intervenors, the PCSSD and the NLRSD. The LRSD filed a document entitled, "Objection of the Little Rock School District to the Findings and Recommendations of the Special Master Regarding the Proposed Settlement Agreement, As Amended." The State Board of Education filed a "Response of the State Board of Education to the Findings and Recommendations of the Special Master."

5. The student assignment "bargain" which this court rejected by Order of June 27, 1989, would have resulted in the designation of one-fourth of the elementary schools in LRSD as virtually all black schools for an indefinite period of time.

6. The parties have made numerous attempts to reach a financial settlement in this case. The document currently submitted for approval was finalized September 28, 1989. The changes effected by the parties required a renotification of class members as to the terms of the settlement.

tricts would default in their responsibilities, then attempt to bind this court by "bargaining" with each other as to what remedies the court-appointed expert could or could not use, is incredible.[7]

The parties' repeated reliance on *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir.1980) is misplaced. In that case, the district court had approved a desegregation plan for Milwaukee to which all parties had agreed. Dissatisfied members of the class of black plaintiffs brought the appeal asking the Court of Appeals for the Seventh Circuit to declare that the district court had abused its discretion in approving a plan that had a *possibility* of resulting in *a few* all-black schools. The opposing class members contended that a plan which permitted any all-black schools was *per se* unconstitutional.

The *Armstrong* case has been cited by the Eighth Circuit Court of Appeals on three occasions:

> Although in approving a settlement the district court need not undertake the type of detailed investigation that trying the case would involve, *see Armstrong v. Bd. of School Directors of Milwaukee*, 616 F.2d 305, 314–15 (7th Cir.1980), it must nevertheless provide the appellate court with a basis for determining that its decision rests on "well-reasoned conclusions" and not "mere boilerplate."

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir.1988).

> To overcome this presumption of unconstitutionality [of one-race schools], a court must find that the existence of one-race schools is justified in light of the particular facts of the case and the feasibility of other desegregation techniques. *Armstrong v. Bd. of School Directors*, 616 F.2d 305, 321–322 (7th Cir. 1980).

*Liddell v. State of Missouri*, 731 F.2d 1294, 1314 (8th Cir.1984).

Class members were also notified of the conditions recommended by the Special Master.

**7.** It is all the more inappropriate since the parties knew at the time they consummated the

Under all of these circumstances, we cannot say that the district court clearly erred in holding that the Partial K–6 Plan is constitutional. The creation of four all-black schools in and of itself is not a constitutional violation ... *Armstrong v. Board of Education*, 616 F.2d 305, 321–322. In so holding, however, we emphasize the importance of the School Board's commitment to ensuring that equal educational opportunity is provided to all students within the Little Rock School System ... Absent [the] finding of [a] unitary system, [the] district court has a continuing responsibility to appraise the system in light of actual conditions and experience and to make required changes.

*Clark v. Board of Education of Little Rock School District*, 705 F.2d 265, 272–273 (8th Cir.1983).

The *Armstrong* Court never suggested that a district court should fail to scrutinize a settlement agreement. To the contrary:

> Settlement of a class action is not, however, an unmixed blessing. Balanced against the "overriding public interest in favor of settlement" are strong countervailing public policies which counsel against automatic judicial acceptance of such agreements. First and foremost is the fact that most of those whose rights are affected by a class action settlement—the members of the class—are not involved in its negotiation nor are they present to voice their views in court. The class members must rely upon the representation of the class representatives and class counsel to protect their interests. While this representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interest can best be served by a settlement which is not in the best interests of the class as a whole. Similarly, class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which

financial settlement that the person appointed to develop the plan specializes in the effective use of magnet schools.

leaves the class with less relief than could have been procured through more vigorous negotiation. In such cases, the class members may find that substantial rights have been bargained away in exchange for relief which inures primarily to the benefit of a few class members or class counsel.... Uncritical acceptance of a class action settlement can, therefore, disturb important national policies beyond the immediate impact upon the rights of class members.

*Armstrong*, 616 at 313. The *Armstrong* Court went on to hold:

We share the concern expressed by the Fifth Circuit and acknowledge the wisdom of its statement: "While we deplore contributing further to the seemingly Methuselean duration of this case, we would not substitute one hour of efficiency for one moment of justice."

*Id.* at 327. In sum, the *Armstrong* decision focused on the district court's approval of a *desegregation plan*. The objectors in this case are fully aware that there is no approved plan in this case. For the parties to bargain, on the front end, that a particular remedy cannot be employed by the *court-appointed expert* charged with the task of developing a plan is unacceptable and will not be tolerated.[8]

The parties agreed, on the record, in open court, that the settlement would be binding, even if the clarifications and guarantees were added, except that certain provisions were identified by the parties as unchangeable. Each party had ample opportunity to advise the court of provisions which, if modified, would cause withdrawal from the settlement. None of the conditions or guarantees recommended by the Special Master, nor any modifications I have made, affects those provisions so identified.

■ The parties have bound themselves. There *is* a settlement. There is no requirement that the court-appointed Metropolitan Supervisor yield to the demand of recalcitrant school districts that there be no more interdistrict magnet schools. The parties' agreement that the manner of *funding* any new magnets shall differ from that of the existing six magnet schools is acceptable.

The districts concede that, "there was nothing [in the settlement] which would prohibit the Court from requiring *intra* district magnet schools where necessary." This concession supports this court's conclusion that once the districts have defaulted on their obligation to present a timely, workable, and constitutional plan, they cannot dictate the remedies to be used. They can, however, agree to an apportionment of costs.

■ The most disconcerting "objection" raised by the parties is this: "[N]o constraints were negotiated for the use of settlement proceeds" (Joint Objection at 16). "The parties agreed there would be no restrictions attached to the use of the settlement proceeds to retire budget deficits. As was explained before, courts should not attempt, and, in this context, *do not have authority* to change the agreement of the parties" (Joint Objection at 15). [Emphasis added].

The parties—*including those designated to represent the interests of black children*—unabashedly contend that the money that the State of Arkansas has paid for the benefit of black school children—the money it owes to the children—will not necessarily be used for those children. And in any event, it is none of the court's business how the money is used.

Let there be no misunderstanding. The school districts are not the victims of the State's conduct. Rather, each of these districts has also been found to be a constitutional violator. The money provided by the State will be used for its intended purpose.

---

8. It is inconceivable that the parties seek to proscribe the one *voluntary* desegregation tool available. The attitude is even more puzzling in light of the peculiar success that magnet schools have enjoyed in these three districts. Coupled with their argument against voluntary desegre- gation with magnet schools, the districts brazenly continue to argue for "neighborhood schools." The unmistakable conclusion this court must draw is that there are those who are determined to oppose any workable solution to dismantling the dual school systems.

That the parties would even consider using these funds for any purpose other than to provide educational compensation to the children who were victims of the State's prior unconstitutional actions, shocks the conscience of this court. Frankly, I had considered the Special Master's conclusion that I should require the settlement money to be used for the proper purpose—remedial and compensatory education—to be superfluous.

■ It is now abundantly clear that the settlement funds cannot be entrusted to the parties. The amount of money is meager enough. To put the money into the hands of those who feel no compunction even to say they intend to spend the money to compensate the victims of racial discrimination would be a grave injustice.

Accordingly, the settlement monies will be paid into an escrow account. The Metropolitan Supervisor will approve all disbursement from the fund. The money will be used to implement the plan currently under construction, to reimburse compensatory and remedial education costs for the current year and to retire deficits *attributable to desegregation*. The record of the hearing before the Special Master indicates that the Little Rock School District has a $5.5 million deficit attributable to desegregation; the PCSSD has a deficit of $1.4 million attributable to desegregation; NLRSD has no deficit. Payments for the prior year's deficits should be limited to those amounts.

At the conclusion of the Metropolitan Supervisor's three-year term, the court will consider modifications to the method of disbursement of the funds.

9. The Special Master discovered some of the areas of non-compliance in the hearings on the Amended Settlement Agreement. Subsequently, the LRSD filed a motion requesting to be excused from compliance.

10. The LRSD had proposed to create eight all-black elementary schools as "Incentive Schools." The LRSD proposal was rejected by the June 27, 1989 order of this court because, *inter alia,* the educational components were vague and non-specific, there was no plan for

## V. NON–COMPLIANCE WITH COURT ORDERS

I must now take up the matter of non-compliance of the Little Rock School District with this court's orders for the current school year. After complaining bitterly about the Special Master's May 10, 1989 Findings that the LRSD had failed to abide by court-ordered enhancements in all-black schools, it is now revealed that, again this year, few of this court's requirements for the all-black schools have been met.[9] The LRSD apparently intends to continue its course of complying only with court orders it likes. Once again the areas of non-compliance concern the all-black schools. The LRSD ignored and failed to implement virtually every educational component which would justify the existence of all-black schools. This includes approved portions of *their own plan* for the proposed "Incentive Schools."[10] This lack of commitment and LRSD's track record for failing to follow through in part accounted for my previous finding that the plans, as submitted, were unacceptable.

The failure to follow through, even with their own proposals for the Incentive Schools—proposals the Special Master recommended and I approved at their request—belies their protestations that their plan *was* complete and *was* ready for implementation. Unfortunately, the actions of the LRSD in this current school year confirm this court's conclusion that "the plan" was merely a "plan for a plan," that the vague proposals were inadequate, and that the LRSD was incapable of implementing the plans, as written. Approval of that plan would, doubtlessly, have resulted in many one-race schools with nothing to justify their existence.

eventually integrating the schools, and the proposed "double funding" would have ceased at the end of six years. It was, and is, my firm conviction that the LRSD plan, as written, would have resulted in segregation in public schools unmatched in this city since the 1950's. The inability of LRSD to deliver court-ordered services to students in racially isolated settings during the 1988–89 school year indicated a need for added caution in permitting the creation of all-black schools.

LRSD, in a motion for modification of its plan for the 1989–90 school year, concedes that it has failed to comply with the following orders of this court:

1. Vacate and restaff teaching positions in the Incentive Schools;

2. Vacate and restaff teaching positions at Dunbar Junior High School; [11]

3. Institute an International Studies/Gifted and Talented specialty program for Dunbar Junior High School; [12]

4. Implement enhanced programs *proposed by the parties* at the all-black Incentive Schools.[13]

5. Discontinue the addition of portable buildings at schools where their use results in the reflection of segregated residential patterns in the school;

6. Populate the new Washington Elementary School with students currently in racially isolated classrooms, with 1988–89 King kindergarten students,[14] and with students from Woodruff Elementary which *LRSD had asked to close*.[15] Instead, LRSD reassigned other children to Washington, knowing that the new plan being developed by the Metropolitan Supervisor might require that those children (virtually all black children) be moved again in the 1990–91 school year.[16]

7. Permit desegregative transfers for elementary students.

■ The LRSD motion for modification of the order for the 1989–90 school year was filed October 6, 1989, and then only after the Special Master had discovered several areas of non-compliance in the course of the hearings on the settlement agreement.

The attorneys for LRSD knew full well at least by August of 1989 that the district had no intention of complying with the June 27, 1989 order. There is no reason offered in the motion for the delay in notifying the court of the non-compliance and asking that the Order be modified.

Of course the court cannot require the impossible. By the time the motion was filed, it *was* too late to comply. That does not excuse the non-compliance, nor the delayed and reluctant reporting to the court. The motion is denied. However, for the benefit of the children, the court will not disrupt their current assignments.

While I contemplate what further action to take relative to the blatant disregard of the court's prior orders, the Special Master is hereby directed to monitor compliance for the remainder of this school year to see that the court's order is implemented to the extent possible.

---

**11.** Dunbar Junior High School is significantly out of compliance with the guidelines established by the Eighth Circuit.

**12.** LRSD had proposed measures to augment Dunbar (i.e. lengthening the school day at Dunbar to permit seven class periods rather than six). None of these measured were implemented.

**13.** The failure to implement the special programming in the Incentive Schools is particularly vexing. I did not approve the Special Master's recommendation for pairing four elementary schools for the 1989–90 school year for the sole reason that I wanted all efforts directed toward implementing the augmentation in the Incentive Schools. LRSD's contention that they did not understand that they were to implement the Incentive programs *they had proposed* is not credible. My order of June 27 stated: "As previously announced, the school assignments in LRSD for the 1989–90 school year are approved as recommended by the Special Master, except that the pairings of Fulbright, Romine, McDermott, and Franklin shall not be implemented.

*Instead,* LRSD is directed to focus time and effort toward completing the Incentive School programs." Interim Order, June 27, 1989, p. 22. [Emphasis added.]

**14.** King School had been closed by the LRSD, but was reopened for one year only to accommodate five kindergarten classes.

**15.** In July, 1989 the LRSD Board of Education voted unanimously to change its request to close Woodruff. I have no objection to the continued use of Woodruff as an Elementary School. It is located reasonably close to both black and white students.

**16.** LRSD's excuse that it was concerned that compliance with the court's order would not have filled the 840 seats in the new school is unacceptable. In truth, LRSD expanded—virtually doubled—the capacity of the new Washington school *without* court approval. The court's approval was sought, as with the pending motion, after the irrevocable decision had been made.

**1554**

## VI. THE LONG–RANGE PLAN

■ The parties have inexplicably filed with the court a document entitled "Stipulated Compensatory Education Programs to be Implemented by the North Little Rock School District With Settlement Monies." The achievement disparity between black children and white children in NLRSD is alarming, as previously noted. I have appointed a Metropolitan Supervisor to develop and present a plan to address the problem. It is my understanding that the educators and parents in NLRSD are currently developing such a plan, under Mr. Reville's guidance. It is absolutely inappropriate for the lawyers in this case to "bargain" for compensatory education programs. The pleading is ordered stricken from the record.

## VII. ATTORNEY FEES

■ There is one other matter pertaining to the settlement agreement which I must address. I cannot in good conscience approve the settlement provisions regarding attorney fees. For some inexplicable reason the settlement assesses two million dollars in attorney fees in favor of the Joshua intervenors against the LRSD. "The State will advance LRSD's share of the fees and reduce total payments due LRSD under this agreement by that amount." There is no basis for imposing such an obligation against the LRSD. The suit was filed in 1982. The Joshuas intervened in 1984. The claimed fee from LRSD thus amounts to $400,000 per year.

It was the LRSD initiative which obtained the state funds available under this settlement. In the initial decision of the Court of Appeals in this case, the court said:

> If the four all- or nearly all-black elementary schools as conditionally allowed by this Court in *Clark v. Board of Education of Little Rock,* 705 F.2d 265 (8th Cir.1983), are retained in LRSD, compensatory and remedial programs of the type that we required for the nonintegrated schools in St. Louis shall be put into effect for the four schools. *See Liddell v. State of Missouri,* 731 F.2d at

1312–18. *The additional cost of these programs shall be paid for by the State of Arkansas.*
*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.,* 778 F.2d 404, 435 (8th Cir. 1985) (emphasis added).

The LRSD on the basis of *interdistrict* violations convinced the Court of Appeals to broaden the State's obligation. "LRSD asked the District Court to fund compensatory programs in all elementary schools, contending that the black students in these schools were in need of compensatory and remedial training because they had been deprived of their constitutional rights for so many years." *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.,* 839 F.2d 1296, 1306–07 (8th Cir.1988). The Court of Appeals extended the State's obligation "to those having a black student population of 81% or more as of September 13, 1987." *Id.* at 1307.

On the basis of *intradistrict* violations, the Court of Appeals found that it was "appropriate to include compensatory and remedial programs in LRSD that are not racially identifiable." *Id.* at 1308. The record in this case reflects that while the Joshua intervenors joined in this argument, it was the LRSD that played the leading role.

It is inconceivable that the party who played the principal part in obtaining these settlement funds can now be charged attorney's fees for its successful efforts. The settlement documents state that the fees paid to the Legal Defense Fund purportedly cover "work performed in this litigation beginning with *Cooper v. Aaron,*" the original Little Rock School District case dating back to 1957. *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) was litigated long ago. Of the two principal attorneys in that case, one is deceased and the other is an Associate Justice of the Supreme Court of the United States. The other principal case involving LRSD, *Clark v. Board of Education of Little Rock School District,* 369 F.2d 661 (8th Cir.1966) is still pending but is assigned to another district judge. No substantiating documents or time records were filed in sup-

port of this enormous claim for attorney fees.

There is absolutely no justification for awards purportedly earned in other cases (some of which were terminated decades in the past) against the LRSD on the issues now being settled. LRSD was the principal prevailing party. Why should such a party pay the fees and costs of another prevailing party who played a much lesser role? The effect would be to reduce by two million dollars the funds available to the black children of the LRSD for compensatory and remedial education.

Determination of the amount owed by the State under the mandate of the Circuit Court of Appeals is my responsibility. The initial calculation was delegated to a special master. All recognized that many millions would be required. The attorneys for the State Department of Education, the Governor and other state officials began a long process of negotiating a settlement of the state's obligation. Their efforts culminated in a settlement agreement which was executed by all the parties. The fund to implement the settlement was appropriated by the legislature as Act 1 of the Second Extraordinary Session of 1989 signed by the Governor on July 28, 1989.

■ The funds which the State agreed to pay directly to the Legal Defense Fund stand on a different basis. The State was in an adversarial posture with respect to the Joshua intervenors. Attorneys for the latter played some part in obtaining a favorable decision on the State's obligation for compensatory and remedial training for the black children. If the matter had not been settled, these attorneys would have been entitled to attorney fees in some amount, based on reasonable hourly charges. I cannot believe that the charges would have been anywhere near the $750,-000 which the State agreed to pay under the settlement terms. However, the State owed an unliquidated sum, which it had a right to settle, albeit for what I conceive to be an exorbitant amount. Therefore, approval is reluctantly granted for the $750,-000 fee the State agreed to pay the Legal Defense Fund of the NAACP.

The $300,000 in fees which the PCSSD agreed to pay the LDF cannot be justified on the record. It has cross-claimed against the State for recompense for constitutional violations in the same manner as the LRSD. Although the latter took the initiative and bore the principal burden, PCSSD is also a prevailing party. The same reasons set out, *supra*, with regard to the LRSD are applicable to the PCSSD. The impact on the latter district is not as severe, but the principle is the same. The PCSSD fee is also disapproved. NLRSD agreed to pay $100,000 in attorney fees to the Joshua intervenors. The basis is not made clear in the settlement agreement. However, the sum has already been paid by that district, without awaiting scrutiny by me. Since the fees have already been paid, the question is moot. I will leave the issue of its recovery to other proceedings or other litigation.[17]

Ample authority exists for a district court to control attorney fees paid in connection with the settlement of a claim. Particularly is this true where minors are involved—minors of a protected class. The federal courts have historically controlled attorney fees charged against minor plaintiffs. Such a case was *Hoffert v. General Motors Corp.*, 656 F.2d 161 (5th Cir.1981) where the court found that the fee provided in a contract was excessive. Although it approved the settlement of a suit for injuries to a minor, the court substantially reduced the attorney fees. "A district court abuses its discretion when it allows a fee without carefully considering the factors set forth in DR2–106(B) of the ABA Code of Professional Responsibility and elaborated in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974)." *Id.* at 166. *See also Rosquist v. 500 Line R.R.*, 692 F.2d 1107 (7th Cir.1982).

The federal courts have also been very careful to shield members of a protected

17. The settlement called for payment of half of the NLRSD on or before July 1, 1989 and the remainder on or before July 1, 1990.

class such as seamen in situations where attorney fees are paid in connection with settlements. The broad authority of district courts in such cases was sustained in *Schlesinger v. Teitelbaum*, 475 F.2d 137 (3d Cir.1973) as a proper exercise both of the power to "make and amend rules governing its practice," F.R.Civ.P. 83, and the "inherent power of [the] courts to take appropriate action to secure the just and prompt disposition of cases." 475 F.2d at 141–42.

The power of federal courts over fee arrangements in settlements is not restricted to those involving minors and members of a protected class. In an antitrust case Judge Judy Coffin of the First Circuit wrote, "The Courts generally are not without power to modify excessive fee arrangements." *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 87 (1st Cir.1970). And in a wrongful death action filed by a widow-administratrix on behalf of herself and her children, the Third Circuit rendered a similar holding. *Elder v. Metropolitan Freight Carriers, Inc.*, 543 F.2d 513 (3d Cir.1976). This circuit has affirmed the modification of the fee in a criminal case for excessiveness. *Coffelt v. Shell*, 577 F.2d 30, 32 (8th Cir.1978).

Even more significant is the case of *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105 (6th Cir.1979) which, like the instant case, involved attorney fees paid from a settlement fund:

> [T]he district court may properly inquire into the reasonableness of an attorney's fee which, whether or not agreed to by contract, is to be satisfied through a settlement fund.
>
> Further, this inquiry is not limited to an analysis of whether the fee contracts are reasonable on their face. Rather, the court looks to a variety of factors.

602 F.2d at 1110.

Here the relief and the remedy provided by the Court of Appeals was to compensate the black children for wrong committed by the State of Arkansas. Where attorney fees are assessed in such circumstances, they not only tax the faulty party (the State in this instance) but benefit the wronged parties (the black school children). Here the settlement taxes the wronged party for attorney fees. The party at fault pays not one cent more than otherwise owed. Surely the black children of Pulaski County should not be made to pay ($2,400,-000) three times the fee required from the state ($750,000). Such a result would not be legal, moral nor equitable.