921 F.2d 1371
 65 Ed. Law Rep. 41
 LITTLE ROCK SCHOOL DISTRICT;
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy
Joshua, and Wayne Joshua, et al., Intervenors Below,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; Dr. J.F.
Cooley, Sherly Dunn, Shirley Lowery, Sara Brown,
Doyan Matthews, Mildred Tatum; Mack
McAlister, Appellants,
North Little Rock School District, et al.;
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy
Joshua, and Wayne Joshua, et al., Intervenors Below,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; Dr. J.F.
Cooley, Sherly Dunn, Shirley Lowery, Sara Brown,
Doyan Matthews, Mildred Tatum; Mack McAlister,
North Little Rock School District; Vicki Stephens; Ginny
Jones; Murry Witcher; Dixie Harrison; Larry
Lazenby; Rose Wilshire, Appellants,
Arkansas State Board of Education, et al., Appellees.
LITTLE ROCK SCHOOL DISTRICT,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy
Joshua, and Wayne Joshua, et al., Appellants,
Katherine Knight, Individually and as President of the
Little Rock Classroom Teachers Association (LRCTA), et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; et al.,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellant,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy
Joshua, and Wayne Joshua, et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; et al.,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy
Joshua, and Wayne Joshua, et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, et al., Appellants,
Mac Faulkner, et al.,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellee,
Anne Mitchell, et al.,
Alexa Armstrong, Karlos Armstrong, Appellants,
Ed Bullington,
Khayyam Davis, Appellant,
Janice Dent, John Harrison, Alvin Hudson, Tatia Hudson, Appellants,
Milton Jackson,
Lorene Joshua, Leslie Joshua, Stacy Joshua, Wayne Joshua, Appellants,
Katherine Knight,
Sara Matthews, Appellants,
Becky McKinney,
Derrick Miles, Janice Miles, John M. Miles, NAACP, Appellants,
Joyce Person,
Brian Taylor, et al., Appellants,
v.
PULASKI COUNTY SPECIAL SCHOOL DIST. # 1, North Little Rock
School District, Appellee,
Arkansas State Board of Education, Appellee,
Leon Barnes, Sheryl Dunn, Ruth White Tucker, Mac Faulkner,
Richard A. Giddings, Marianne Gosser, Mack McAlister,
Earle Love, Appellee,
Shirley Lowery, Bob Lyon, George A. McCrary, Dr. Harry P.
McDonald, Bob Moore, Steve Morley,
Robert L. Newton, Appellee,
Rae Perry, Mildred Tatum, Doyan Matthews,
Jeff Starling, L.D. Harris, Elaine Scott, Nancy Wood, State
of Arkansas, Appellees,
Bob Stender,
Walter Turnbow, Appellee,
Dale Ward, John Ward, Judy Wear, Grainger Williams, Dr. J.F. Cooley,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellee,
Anne Mitchell, et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT # 1, Appellant,
North Little Rock School District,
Arkansas State Board of Education, Appellee,
Leon Barnes,
Sheryl Dunn, Ruth White Tucker, Appellants,
Mac Faulkner, Richard A. Giddings, Marianne Gosser,
Mack McAlister, Appellant,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellee,
Anne Mitchell, et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT # 1, North Little
Rock School District, Appellants,
Arkansas State Board of Education, Appellee,
Leon Barnes, Appellant,
Sheryl Dunn, Ruth White Tucker, Mac Faulkner, Richard A. Giddings,
Marianne Gosser, Appellant,
Mack McAlister,
Earle Love, Appellee,
Shirley Lowery,
Bob Lyon, Appellant,
George A. McCrary, Dr. Harry P. McDonald, Bob Moore,
Steve Morley, Appellant,
Robert L. Newton, Appellee,
Rae Perry, Mildred Tatum, Doyan Matthews,
Jeff Starling, L.D. Harris, Elaine Scott, Nancy Wood, State
of Arkansas, Appellees,
Bob Stender,
Walter Turnbow, Appellee,
Dale Ward,
John Ward, Judy Wear, Appellants,
Grainger Williams, Dr. J.F. Cooley,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellee,
Anne Mitchell, et al.,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT # 1, North Little
Rock School District, Appellants,
Arkansas State Board of Education, Appellee,
Leon Barnes, Sheryl Dunn, Ruth White Tucker, Appellants,
Mac Faulkner, Richard A. Giddings,
Marianne Gosser, Mack McAlister, Appellants,
Earle Love, Appellee,
Shirley Lowery, Bob Lyon, Appellants,
George A. McCrary, Dr. Harry P. McDonald, Bob Moore,
Steve Morley, Appellant,
Robert L. Newton, Appellee,
Rae Perry,
Mildred Tatum, Doyan Matthews, Appellants,
Jeff Starling, L.D. Harris, Elaine Scott, Nancy Wood, State
of Arkansas, Appellees,
Bob Stender,
Walter Turnbow, Appellee,
Dale Ward,
John Ward, Judy Wear, Appellants,
Grainger Williams,
Dr. J.F. Cooley, Appellant,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
LITTLE ROCK SCHOOL DISTRICT, Appellee,
Anne Mitchell, Bob Moore, Pat Gee, Pat Rayburn, Mary J.
Gage, North Little Rock Classroom Teachers
Association, Pulaski Association of
Classroom Teachers, Little
Rock Classroom
Teachers Association,
Alexa Armstrong, Karlos Armstrong, Appellants,
Ed Bullington,
Khayyam Davis, Appellant,
Janice Dent, John Harrison,
Alvin Hudson, Tatia Hudson, Appellants,
Milton Jackson,
Lorene Joshua, Leslie Joshua, Stacy Joshua, Appellants,
Katherine Knight,
Sara Matthews, Appellant,
Becky McKinney,
Derrick Miles, Janice Miles, John M. Miles, NAACP, Appellants,
Joyce Person,
Brian Taylor, et al., Appellants,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT # 1, North Little
Rock School District,
Arkansas State Board of Education, Appellee,
Leon Barnes, Sheryl Dunn, Ruth White Tucker, Mac Faulkner,
Richard A. Giddings, Marianne Gosser, Mack McAlister,
Earle Love, Appellee,
Shirley Lowery, Bob Lyon, George A. McCrary, Dr. Harry P.
McDonald, Bob Moore, Steve Morley,
Robert L. Newton, Appellee,
Rae Perry, Mildred Tatum, Doyan Matthews,
Jeff Starling, L.D. Harris, Elaine Scott, Nancy Wood, State
of Arkansas, Appellees,
Bob Stender,
Walter Turnbow, Appellee,
Dale Ward, John Ward, Judy Wear, Grainger Williams, Dr. J.F. Cooley,
Nola Burl, Pat Rayburn, Morris Thompson, Theressa Wesley,
and John McNee (Burl Intervenors), Appellees.
 Nos. 89-2288, 89-2289, 89-2352 to 89-2354, 90-1165 to
90-1167, 90-1579 and 90-1580.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 21, 1990.
Decided Dec. 12, 1990.
 
 Norman Chachkin, New York City, Christopher Heller, M. Samuel Jones, John W. Walker, Stephen W. Jones, Little Rock, Ark., for appellants.
 John T. Lavey, H. William Allen, Little Rock, Ark., for appellees.
 Before ARNOLD and WOLLMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 We have before us another chapter in the Little Rock school desegregation case, in the form of ten separate appeals from various orders of the District Court. The case has its roots in the 1950's, when the Supreme Court definitively announced that public opposition to desegregation of the races, no matter how deeply entrenched, could not be allowed to interfere with the full realization of the constitutional rights of black citizens. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).
 
 
 2
 The present phase of the case began in 1982, when the Little Rock School District (LRSD) brought suit against the two other school districts in Pulaski County, Arkansas, claiming that the Constitution compelled the consolidation of the three districts into one governmental unit. We rejected this claim in Little Rock School District v. Pulaski County Special School District, 778 F.2d 404 (8th Cir.1985) (en banc), cert. denied, 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986). We held, however, that interdistrict constitutional violations had occurred, and directed that certain remedial steps be taken. On remand, various remedial orders were entered, and various further appeals were taken to our Court, the nature of which we shall describe, to the extent necessary for an understanding of the issues now before us, in the course of this opinion.
 
 
 3
 Then, in 1988 and 1989, in a sharp departure from the adversary bitterness that had marked this controversy for over thirty years, the parties, including the Joshua intervenors, representing the injured class of black schoolchildren and citizens, LRSD, the North Little Rock School District (NLRSD), the Pulaski County Special School District (PCSSD), and the State of Arkansas,[1] agreed to settle the case. They submitted to the District Court comprehensive agreements covering both interdistrict and intradistrict desegregation measures--agreements referred to by the parties as the "settlement plans." They also submitted a separate but related document, called the "settlement agreement," settling the financial liability of the State of Arkansas for something over one hundred million dollars.
 
 
 4
 The District Court rejected both the settlement plans and the settlement agreement, as submitted. It purported to modify them and to order the unwilling parties to put them into effect as modified. It also created the Office of Metropolitan Supervisor and conferred upon the occupant of that office a wide array of powers over all three school districts, amounting virtually to a de facto consolidation of these entities. Most of the affected parties appealed. None of the parties below asked that the judgment be affirmed in its entirety. A group of parents, however, was allowed to intervene in this Court in support of the judgment.
 
 
 5
 We now reverse the judgment of the District Court. In general, we direct that Court, on remand, to approve the settlement plans and settlement agreement as submitted by the parties. We also make certain other directions for the future of the case.
 
 I.
 
 6
 A brief reference to the procedural history of this case may serve to put the issues on the present appeals into an intelligible context. As we have noted above, this Court, sitting en banc in 1985, held that consolidation was not constitutionally required.[2] We also held, however, agreeing in this respect with the District Court, that interdistrict violations of the Constitution had occurred, and that an interdistrict remedy was accordingly required. We directed the District Court, on remand, to adjust the boundary between LRSD and PCSSD in two respects: (1) by transferring the Granite Mountain area from LRSD to PCSSD; and (2) by expanding LRSD so that the new boundary line between it and PCSSD would be the city limits of the City of Little Rock, as they then existed. We further held--addressing the question of student attendance within each of the districts--that "each school district as reconstituted shall be required to revise its attendance zones so that each school will reasonably reflect the racial composition of its district." Little Rock School District v. Pulaski County Special School District, supra, 778 F.2d at 435. Our opinion included a number of other directions with respect to magnet schools, student-attendance arrangements, and other matters.
 
 
 7
 On remand from our en banc decision, several remedial developments occurred of relevance to the present appeals. For one thing, NLRSD proposed a plan to comply with our en banc opinion. The District Court approved the plan, 659 F.Supp. 363, 368 (E.D.Ark.1987), and no one appealed. For another, the City of Little Rock annexed certain additional territory, and the question arose whether our direction that LRSD be expanded to the city limits referred to the city limits as they existed at the time of our en banc opinion, or to the city limits as they might exist from time to time in the future. The District Court held that LRSD would automatically expand whenever the city annexed new territory, so that LRSD would always be contiguous with the city as it existed from time to time. We reversed. We held that the remedy contemplated by our en banc opinion was intended to be a complete cure for all interdistrict violations that we had found. The en banc opinion, we said, prescribed "a full and sufficient correction of wrongs done in the past," including all interdistrict violations. Little Rock School District v. Pulaski County Special School District, 805 F.2d 815, 816 (8th Cir.1986) (per curiam).
 
 
 8
 In addition, a controversy arose with respect to student assignments within PCSSD. We held that these assignments must, in general, conform to the racial percentages specified in a plan submitted by PCSSD in January of 1987. We held that black enrollment in PCSSD schools, with some exceptions, would have to be within a range of 18 to 30 per cent.[3] This range represents a 25 per cent. variance from the overall racial composition of PCSSD, which at that time was 24 per cent. black. We emphasized that this prescribed range was to be used as "a guideline for the subsequent remedy, and not as a rigid quota." This range was subject, in any event, to the proviso that a "forty-five minute limit on busing" of students, one way, would be a "cap for purposes of desegregating PCSSD schools." Little Rock School District v. Pulaski County Special School District, 839 F.2d 1296, 1304-05 (8th Cir.), cert. denied, 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988). We authorized the District Court to "allow deviation beyond the [prescribed percentage] range[s] in black enrollment if necessary to keep one-way busing times within the forty-five minute limit...." 839 F.2d at 1306. We did so because we recognized the existence of "practical limits to the remedial use of desegregation student assignments, particularly where the time or distance of travel risks damage to the health and education of school children." 839 F.2d at 1305.
 
 
 9
 After our 1988 decision, proceedings continued on remand to ensure that all three districts would be in compliance with the Constitution, as interpreted by our opinions in the case. One of the pressing questions that had to be addressed was the construction of a student-assignment plan that would meet the percentage requirements we had laid down for PCSSD schools. To their great credit, the Joshua intervenors and PCSSD began to work together towards this end. They jointly proposed that the school year 1988-89 be a "stabilizing year," during which the status quo would be essentially maintained, and the parties would work together in an attempt to draft a suitable long-range plan. PCSSD submitted a study indicating that because of demographic changes occurring since January, 1987, when a previous student-assignment plan was prepared, and as a result of the busing time limits that we had established, the racial ratios specified in our opinion could not be attained without disproportionate busing of black students. At about the same time, PCSSD and the Joshua intervenors presented to the Special Master an "Agreement and Recommendation," 5 App. 743-55.[4] This document embodied a suggested joint approach to a long-range student-assignment plan for PCSSD. Elements of this approach included compensatory-education programs; efforts to attract black children from LRSD, at the same time as encouraging white PCSSD children to transfer to LRSD; and additional magnet schools in PCSSD. With this information before it, the District Court approved the proposal to make 1988-89 a "stabilizing year." In doing so, the Court had the benefit of a report of a Special Master finding, among other things, that "a purely intradistrict student assignment plan in PCSSD [meeting the numerical requirements of our 1988 opinion] would result in a greatly disproportionate busing burden on the black students, particularly those students who live in College Station and Granite Mountain." 5 App. 974-75 (Interim Findings and Recommendations of August 2, 1988). In fact, the Special Master found that College Station and Granite Mountain students "are the only students in the [heavily black] Southeast Sector who can be transported out of the Southeast Sector to a PCSSD school within 45 minutes." Thus, for example, it would be "extremely difficult, if not impossible," to transport students from the virtually all-black Sweet Home and Wrightsville communities to PCSSD schools outside the area within the specified time limit. 5 App. 944, 946-47.
 
 
 10
 During the school year 1988-89, counsel for all parties engaged in intense and difficult negotiations in an effort to agree on a comprehensive settlement. These efforts bore fruit. With respect to PCSSD, the parties agreed on a "Permanent Intra-District Desegregation Plan," dated October 3, 1988, 9 App. 1927-2194, as modified by a Supplement dated February 1989, 19 App. 5275-89. This PCSSD Plan proposed to take the student-assignment arrangement in effect for the year 1988-89 as a base for future development. PCSSD would actively recruit black LRSD students for its magnet schools and would promote other voluntary majority-to-minority interdistrict transfers. So far as racial ratios were concerned, the Plan included the following goals:
 
 
 11
 13. With the exception of Bayou Meto, the goal of the plan shall be to achieve a minimum black student enrollment of 20% by the end of six years in all PCSSD schools....
 
 
 12
 14. With the exception of Bayou Meto, it is hoped that the dynamics of the plan will result, by the end of the implementation period, in all PCSSD schools being within the range of plus or minus 25% of the then prevailing district-wide average of blacks by organizational level. However, at a minimum, at the end of the implementation period, no PCSSD school shall have a black enrollment which exceeds the then prevailing black ratio, by organizational level, in the Little Rock School District. If the ratios have not been achieved at the end of six years, the 1989 plan shall be completely reevaluated by all parties and the Court. Upon that event the Joshua Intervenors may ap[p]ly for implementation of a mandatory reassignment plan in order to achieve a racially balanced school system.
 
 
 13
 9 App. 2178-79 ("Agreement and Recommendation" of PCSSD and Joshua intervenors, May 1988, incorporated by reference in PCSSD's Plan, 19 App. 5274). Thus, the Plan did not ask the District Court to let PCSSD permanently off the hook so far as racial ratios were concerned. Far from it. It included specific goals for attendance percentages, and provided that if the minimum prescribed goal was not met, all bets would be off. The Plan would be open to complete reevaluation, and the Joshua intervenors would be free, notwithstanding their agreement with the Plan as submitted in 1989, to apply to the District Court for mandatory student reassignments to achieve a racial balance.
 
 
 14
 NLRSD's plan had already been approved by the District Court, so it did not submit a separate long-range plan as part of the comprehensive settlement. It did, however, propose certain agreed modifications of its plan, including specific provisions for magnet-school and majority-to-minority recruitment, both intradistrict and interdistrict. See 8 App. 1737-45 (Petition of NLRSD, attached as an exhibit to the Interdistrict Plan, to be discussed shortly).
 
 
 15
 LRSD also submitted a long-range desegregation plan, agreed to (as in the case of other districts' plans) by the Joshua intervenors. The plan was submitted in two volumes, one on January 31, 1989, 7 App. 1514-1703, and one on March 23, 1989, 10 App. 2196-2343. We confine our description of the plan to those features most relevant to the issues on appeal. Eight of the district's 31 non-magnet elementary schools would be designated "Incentive Schools." They would be, at least initially, all black, or virtually so. These schools would receive special compensatory-education programs and markedly increased amounts of money. In fact, they would receive "two times the level [of funding] for the Elementary Academies" in LRSD. 8 App. 1722. The reference to "Elementary Academies" describes 22 of the remaining 23[5] elementary schools. These schools would have projected student ratios of between 50 and 62 per cent. black. Any white student could elect to attend an Incentive School, 10 App. 2199-200, and any student (and the reference here is principally to black students) living in an Incentive School attendance area could opt to attend one of the Elementary Academies, id. at 2199. The plan included a detailed and voluminous description of the kind of programs that would take place at the Incentive Schools. 10 App. 2233-334. A salient feature of these schools would be a maximum effective student-teacher ratio of twenty to one. Id. at 2230.
 
 
 16
 In addition to the individual desegregation plans submitted for each of the three districts, the parties submitted, on February 15, 1989, an "Interdistrict Desegregation Plan." 8 App. 1716-1805. Again, we state those provisions of the Plan with particular relevance to the issues presently on appeal. Students were given the option to transfer from one district to another, with transportation at the expense of the State, if the transfers would promote desegregation. 8 App. 1735. Following our en banc decision in 1985, the parties had by stipulation established six interdistrict magnet schools.[6] The Interdistrict Plan provided, in addition, for six more interdistrict schools. These schools were to emphasize, in the manner of magnet schools so called, certain educational themes. They would be attended primarily by black students from LRSD and white students from PCSSD. They would thus have a desegregative effect, reducing the number of black students in LRSD and the number of white students in PCSSD. Three of these schools were to be in LRSD, and three in PCSSD. Three of them would be in existing buildings (Baker and Harris in PCSSD, and Romine in LRSD), and three would be newly constructed (Crystal Hill in PCSSD and Stephens and King in LRSD; 200 additional classroom spaces would be constructed at Baker Elementary). As the Joshua intervenors, PCSSD, and NLRSD explained in a subsequent filing, no more magnet schools would be established eo nomine. That is, there would continue to be only six interdistrict magnet schools--that phrase being properly used exclusively as a term of art to refer to the six "stipulation magnets" established by the District Court's order of February 27, 1987, with its specific funding and assignment provisions. 14 App. 3563-66. The six new interdistrict thematic schools would, however, be magnet schools in the generic sense--schools with specially fortified curricula designed to aid desegregation by attracting students across district lines.[7]
 
 
 17
 The parties also submitted an agreement, referred to for convenience as the "settlement agreement,"[8] relating to the financial responsibility of the State. This agreement includes a number of significant nonfinancial undertakings, but we concentrate for present purposes on the financial aspects, because they are more directly related to the issues before us on appeal. Under the settlement agreement, the State is to make payments to LRSD, NLRSD, and PCSSD totaling $107,723,175 over the next ten years. In addition, the State agreed to make payments to NLRSD, up to a total amount of $1,276,825, tied to reductions in the district's placement of black students in special-education programs. Moreover, the State agreed to lend LRSD up to $20,000,000 over the next ten years, the loans to be forgiven if by December 31, 2000, the existing gap in achievement between black and white pupils in LRSD has been reduced to 10 per cent. We regard both of these latter two provisions as innovative undertakings adding specific financial incentives to already existing legal obligations for the equal and integrated education of black children.
 
 
 18
 The agreement contains a number of other significant funding provisions. First, interdistrict magnet pupils are to be counted in the formulas used to distribute state minimum-foundation program aid.[9] The agreement also confirms that the State will continue to make payments for (a) one-half the operational costs of the existing six interdistrict magnet schools, (b) sums agreed to be due to "sending" and "receiving" districts for interdistrict majority-to-minority transferring pupils, (c) the State's share of Magnet Review Committee expenses, (d) transportation costs for interdistrict magnet-school students, and (e) transportation costs for interdistrict majority-to-minority transfer students. 14 App. 3449-53. Thus, the agreement includes state financing of majority-to-minority transfer costs, including transportation, not only for the magnet schools properly so called--the six "stipulation magnets"--but also for the "generic magnets" described above--interdistrict specialty-theme schools designed to attract transfer students for purposes of desegregation. Finally, the agreement provides that the districts "may utilize the receipt of funds paid pursuant to this settlement to balance previous years' budgets...." 14 App. 3457.
 
 
 19
 Proceedings then took place in the District Court with respect to the settlement agreement and the various settlement plans. Notice was given to the classes involved, including the class represented by the Joshua intervenors, and a hearing was scheduled on the settlement agreement and any objections thereto. This hearing later took place, but did not produce any objections of substance. Then, on May 30, 1989, the District Court announced in open court that it could not approve either the LRSD settlement plan or the interdistrict plan. It appointed Mr. Eugene Reville, a distinguished educator from Buffalo, New York, to work with the parties as "Metropolitan Supervisor."
 
 
 20
 A written order issued on June 27, 1989, reported at 716 F.Supp. 1162, expanded on and explained the Court's oral ruling. In this order, the Court first disapproved the settlement agreement. The Governor had signed an act of the General Assembly of Arkansas purporting to approve and fund the agreement, but substantial state-law uncertainties surrounded the passage of this law, and the District Court considered the legal ground of the settlement agreement too shaky to justify approval.[10] The order confirmed the appointment of Mr. Reville as Metropolitan Supervisor and conferred upon him "the final word" "in matters concerning desegregation and the expenditure of funds required for successful implementation of plans...." 716 F.Supp. at 1165.
 
 
 21
 The Court explained why it felt it could not approve the settlement plans as submitted. The plans, it thought, were "facially unconstitutional and do not even purport to be within the mandates of the Court of Appeals." Id. at 1169.
 
 
 22
 In LRSD's proposed plan almost one-fourth of the elementary schools are contemplated to be all black. The entire mandatory busing burden at the elementary level for desegregation purposes falls on black children. LRSD, in its objections points out that a few white elementary children are bused, but the fact is that not one white elementary child would be mandatorily bused east of University Avenue. All of the historically "black" schools lie east of University Avenue, and all are proposed to be all-black incentive schools.
 
 
 23
 Double funding is promised for the all-black schools. Yet it is impossible to determine from the submissions how the funds will be spent.
 
 
 24
 716 F.Supp. at 1167.
 
 
 25
 From this order each of the three school districts and the Joshua intervenors appealed. No. 89-2288 is the appeal filed by PCSSD. No. 89-2289 is the appeal filed by NLRSD. No. 89-2352 is the appeal filed by LRSD. And No. 89-2353 is the appeal filed by the Joshua intervenors.
 
 
 26
 While these appeals were pending, the General Assembly of Arkansas reenacted the necessary authorization for the settlement agreement, and did so in a way that eliminated all of the state-law issues that had clouded the validity of its previous action. Thus, the Legislature and the Governor committed themselves to payments, as noted above, in excess of $100,000,000, without being ordered by any court. It is no doubt true that part of the motivation for this action was the fear--perhaps well-founded--that to pursue the defense of the litigation would result in even more extensive relief. However that may be, we think it should be said that the Legislature's enactment of the settlement bill, without precedent so far as we know in any other state, was a significant step towards erasing the legacy of lawlessness that had marked the State of Arkansas's initial reaction to the constitutional requirement of equal, integrated education. At the oral argument, we commended the Governor and the General Assembly for this action, and we now repeat that commendation in this opinion.
 
 
 27
 Following enactment of the settlement legislation, the parties again submitted the settlement agreement to the District Court. On December 11, 1989, see 726 F.Supp. 1544, the District Court rejected the settlement as written. Instead of returning the case to the docket for litigation, however, the Court then added certain conditions to the settlement, purported to approve it as so modified, and directed the parties to carry out the Court's version of the settlement. The Special Master suggested the following conditions on the settlement agreement, and the District Court approved them.
 
 
 28
 1. Although the State's obligation to contribute to the funding of future interdistrict magnet schools shall be limited by the terms of the settlement agreement, there shall be no other limitation on the Court's jurisdiction to order such schools and programs.
 
 
 29
 2. Except as to the State, the settlement agreement shall not be construed to impose any limitation upon the Court's jurisdiction to determine the allocation of costs for any repair or replacement of magnet school facilities.
 
 
 30
 3. Funds provided by the State under the terms of the settlement agreement may be used to retire prior years' deficits only to the extent such deficits accrued as a result of expenditures necessary to comply with the Eighth Circuit mandate and desegregation orders of the Court.
 
 
 31
 726 F.Supp. at 1549.
 
 
 32
 In addition, the District Court's order of December 11, 1989, struck from the record a stipulation concerning compensatory-education programs in NLRSD. This stipulation had been filed in compliance with one of the terms of the settlement agreement. The agreement provided, 14 App. 3483, that
 
 
 33
 [w]ithin fifteen days of the final approval of this settlement, the NLRSD will develop a description of the compensatory education programs to be developed with the additional compensatory education funds made available through this settlement and will petition the court to amend NLRSD's plan accordingly. The State, Joshua, and the Districts will support the NLRSD in this effort.
 
 
 34
 In accordance with this provision, NLRSD had filed, with the approval of all parties to the litigation, a pleading styled "Stipulated Compensatory Education Programs to be Implemented by North Little Rock School District with Settlement Monies." 14 App. 3584-91 (filed October 25, 1989).
 
 
 35
 Finally, the order of December 11 disapproved most of those portions of the settlement agreement calling for the payment of attorneys' fees by LRSD to the Joshua intervenors. The fee question will be discussed in detail, and the provisions of the settlement agreement affecting it described, in part III of this opinion.
 
 
 36
 On January 5, 1990, motions to alter or amend the judgment under Fed.R.Civ.P. 59(e) were denied. The Joshua intervenors, NLRSD, and PCSSD then appealed from the District Court's order of December 11. These appeals are docketed here as Nos. 90-1165,[11] 90-1166, and 90-1167, respectively.
 
 
 37
 In the meantime, Mr. Reville had been working with the districts, the latter under compulsion of the order of June 27, 1989, to develop new desegregation plans. On January 2, 1990, he filed with the District Court his proposal, entitled the "Tri-District Plan." 16 App. 4217-4561. The provisions of this plan will be described as necessary later in this opinion. It is sufficient for present purposes to note that it had many similarities to the plans that the District Court had rejected in June. By order of March 5, 1990, the District Court adopted the Tri-District Plan and directed the parties to comply with it, although a number of the details of the plan remained to be worked out. Tragically, Mr. Reville was killed in an automobile accident on March 17, 1990. No successor to Mr. Reville has been appointed.
 
 
 38
 The last two appeals that are now before us come from the order of March 5, 1990, directing implementation of the Tri-District Plan. They are Nos. 90-1579, filed by NLRSD and PCSSD, and 90-1580, filed by the Joshua intervenors.[12]
 
 II.
 
 39
 We address first the appeals from the order of June 27, 1989, rejecting the settlement plans as submitted by the parties.
 
 
 40
 The most important fact about the present appeals is that they arise out of settlements agreed to by all parties in the District Court. We believe the District Court erred by failing to give sufficient weight to that fact. It treated the case almost as if it were a fully contested matter, with the defendants proposing a certain level of relief (equivalent to the remedy included in the settlement), and the plaintiffs (here, the Joshua intervenors) vigorously objecting to it as constitutionally insufficient. We respectfully disagree with this approach. The law strongly favors settlements. Courts should hospitably receive them. This may be especially true in the present context--a protracted, highly divisive, even bitter litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties, especially the defendants. As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming.
 
 
 41
 This does not mean that a court must automatically approve anything the parties set before it. In the present case, for example, any remedy will necessarily require some judicial supervision--monitoring, at least--for a long time. A court has a strong interest in not involving itself, along with the prestige of the law, in an ongoing equitable decree which is either manifestly unworkable or plainly unconstitutional on its face. In addition, this is a class action, and courts are not obliged (indeed, they are not permitted) to approve settlements that are unfair to class members, or negotiated by inadequate class representatives.
 
 
 42
 If, for example, a court thought that counsel had agreed to inadequate substantive relief in order to get a large fee from the defendants for themselves, there would be a serious conflict of interest, and a settlement could be rejected on that ground alone. It is well to state at the outset that nothing of the kind occurred in this case. The settlement agreement does provide for a large lawyers' fee, but the parties tell us--and no one contradicts them--that the fee was discussed only after all other aspects of the agreement had been concluded, and that prospects of a fee did not influence counsel's negotiating position on the substantive aspects of the case. The District Court made no finding of a conflict of interest, and no basis exists for such a finding. If there were any lingering doubt on this score, it would be dispelled completely by a colloquy occurring at the oral argument before this Court. In response to a question from the bench, counsel for the Joshua intervenors stated without equivocation that his clients would adhere to the substantive aspects of the settlement plans and the settlement agreement, even if the fee portion of the agreement should be disapproved.
 
 
 43
 The District Court rejected the settlement plans (and did so without an evidentiary hearing) because it found them "facially unconstitutional." 716 F.Supp. at 1169. Before examining the reasons given for this holding, we pause to consider for a moment the word "unconstitutional" and the various contexts in which it is used. A settlement plan proposing a return to separate but equal (though they never were equal) schools would be unconstitutional. It would be unconstitutional "on its face"--that is, it would be invalid and rejected out of hand by any court, no matter how much the parties, for whatever reason, wanted it. Less extreme examples come to mind. If the plaintiffs had come into court with an agreement to drop their suit entirely in exchange for counsel fees, that, we take it, would be unconstitutional on its face. It would be a complete failure to address the serious problems of the plaintiff class. What we have here is a conflict of a completely different order of magnitude. It has to do with the details of a comprehensive and complicated remedial scheme.
 
 
 44
 Another example, this one from litigation over prison conditions, may serve to illuminate the point further. Prison-conditions cases, claiming violations of the Eighth Amendment, often allege that numerous deficiencies in prison operations, taken as a whole, cause a prison to fall below constitutional standards. Typically, unless the defendants prevail on the merits, these cases are resolved by the entry of comprehensive and detailed remedial decrees, either by consent or as a result of contested litigation. These decrees often contain rather particularized standards. Such a decree, for example, might require that water in the prisoners' showers be heated to 98 degrees Fahrenheit. (This assumes that one of the prisoners' claims is that they are forced to take showers with cold water.) Thereafter, failure to heat the water to 98 degrees Fahrenheit will be a violation of the decree. In shorthand terms, it might then be said that the Constitution requires that the water be 98 degrees, and that water colder than this is "unconstitutional." Yet, no one would contend that the Eighth Amendment by its own force makes 97-degree water illegal. It is simply the case that a detailed decree is necessary to give practical effect to a court's holding under the rather general standards of the Constitution. For a further explication of this distinction, see Chayes, Foreword: Public Law Litigation and the Burger Court, 96 Harv.L.Rev. 4, 51-55 (1982).
 
 
 45
 Much the same thing takes place in school-desegregation cases. The Constitution does not of its own force forbid, for example, all-black schools, and the Supreme Court has stated this without equivocation. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1970). Even so, where plaintiffs have prevailed, or where a decree by consent has been entered, certain limits may be placed on the number of all-black schools. The same is true with racial percentages in the various schools contained in a school district. The Constitution of its own force does not require any particular percentage. Milliken v. Bradley, 418 U.S. 717, 740-41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1973). Rather, it is the duty of the court, when fashioning a comprehensive remedy, to prescribe a level of relief, including, where appropriate, transportation of students, that will achieve integration to the maximum practicable extent. Once a decree is entered, its terms, including details such as racial percentages, of course become binding on the parties, but these terms are very much a matter of judgment and discretion. There might be a case, for example, where a district court has required the different schools in a district to vary, up or down, no more than 30 per cent. from the overall racial percentages of the district's student population. Such a decree might well be affirmed on appeal, as a proper exercise of discretion, notwithstanding the fact that the appellate court, had it been sitting at the trial level, might have preferred a 25 per cent. variance. By the same token, a voluntary agreement by the parties on a 35 per cent. variance could not be said to be "facially unconstitutional," even if litigation, if pushed to judgment, would have resulted in a somewhat smaller variation from the average.
 
 
 46
 A case decided by the Seventh Circuit is particularly instructive. It is Armstrong v. Board of School Directors of Milwaukee, 616 F.2d 305 (7th Cir.1980), like the present case, a school-desegregation controversy. The Court held, in brief, that "[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." Id. at 315. Settlement agreements carry with them a presumption of acceptability, and "before a settlement may be rejected because it initiates or authorizes a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule." Id. at 321.
 
 
 47
 With this standard in mind, we address the reasons given by the District Court for rejecting the settlement plans. First, it noted that eight all-black elementary schools were proposed for LRSD. Obviously, such non-integrated schools would not be present in a perfect desegregation plan. They should be avoided to the extent practicable. There is, however, no rule of law rendering all-black schools in limited numbers per se illegal. This is especially true in school districts that are already majority black. In order for some schools to be well integrated, it may be necessary to tolerate a small number of all-black schools. This Court itself has approved plans recognizing this necessity. In Jenkins v. Missouri, 807 F.2d 657 (8th Cir.1986), cert. denied, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987), for example, we approved a plan in which 19 of 50 elementary schools had student enrollments of more than 90 per cent. black. And in St. Louis, a court-approved plan included a number of virtually all-black schools. Liddell v. Board of Education of St. Louis, 758 F.2d 290, 293 (8th Cir.1985).
 
 
 48
 The District Court expressed skepticism that the all-black Incentive Schools could ever be integrated. The settlement plans contemplate that this integration will occur through voluntary means. We agree with the District Court that it is far from certain that the means proposed in the plan will succeed in integrating the Incentive Schools to any substantial degree. In our view, however, this does not render the plan unconstitutional on its face. Even the Tri-District Plan proposed by Mr. Reville, and approved by the District Court on March 5, 1990, contemplates six Incentive Schools. 16 App. 4461. This plan envisions that integration will occur through recruitment of white transfer students. 16 App. 4483-87. There are differences between the Tri-District Plan and the settlement plan as to this point, but they are hardly great enough to render the latter facially unconstitutional. Bear in mind, through all of this discussion, that LRSD is committed to per-pupil funding in the Incentive Schools double the district-wide average. We lay particular stress on this commitment. As one of counsel for the Joshua intervenors wisely remarked during the oral argument, it is important which schools students attend, but it is also important what kind of education they receive after they get there. The commitment to provide double funding for the Incentive Schools is crucial to our holding that the settlement plans are not unconstitutional per se. We caution all parties that this commitment must be adhered to at all events.
 
 
 49
 The District Court was also uneasy about the busing burden on black students. It said:
 
 
 50
 The entire mandatory busing burden at the elementary level for desegregation purposes falls on black children. LRSD, in its objections, points out that a few white elementary children are bused, but the fact is that not one white elementary child would be mandatorily bused east of University Avenue. All of the historically "black" schools lie east of University Avenue, and all are proposed to be all-black incentive schools.
 
 
 51
 716 F.Supp. at 1167.
 
 
 52
 In the first place, this view of the facts is exaggerated. Under the LRSD plan, black students are not the only children required to be bused for purposes of desegregation. In addition, a substantial part of the busing is due not to desegregation, but simply to the fact that there are relatively few schools located in the eastern part of LRSD. Even if there were no desegregation decree, substantial numbers of black children would have to be bused out of eastern Little Rock, at least as long as the present configuration of school construction exists. Thus, some degree of busing burden on black students is inescapable. Mr. Reville's plan also recognized this fact. The Tri-District Plan contemplated the same type of mandatory transportation of elementary students as is required by the settlement plan. Mr. Reville remarked:
 
 
 53
 [M]ost of this busing would occur with or without desegregation since there are twice as many students as capacity in central and east Little Rock.
 
 
 54
 16 App. 4240.
 
 
 55
 The District Court was concerned about the lack of sufficient detail in the plans to guarantee successful implementation. The answer to this concern lies, we think, in the fact, upon which we place a great deal of weight, that the parties have all agreed to continued monitoring. Indeed, such monitoring by the District Court and its agents is essential. It is important for the settlement plans to be scrupulously adhered to--and here we have in mind especially the kinds of programs that the plan contemplates for the Incentive Schools--and it will be the job of the District Court to see that this monitoring is done effectively, and that appropriate action is taken if the parties do not live up to their commitments.
 
 
 56
 Finally, the District Court faulted the parties for failing to provide adequately for the Incentive Schools after the initial six-year period. The Court said:
 
 
 57
 LRSD admits that the double funding is guaranteed for only six years, but contends that it "retains its commitment to provide compensatory and enhancement funding to any school which might remain racially identifiable." That "commitment" does not appear in the plan.
 
 
 58
 716 F.Supp. at 1167. We do not see the problem here. If any of the Incentive Schools remains racially identifiable after six years, LRSD has explicitly committed itself to continue providing compensatory and enhancement funding. We interpret this commitment to mean that double funding will be continued with respect to any of the Incentive Schools that, after six years, remain 80 per cent. or more black. See 839 F.2d at 1307. This is a binding commitment on the parties' behalf, just as binding as if it appeared in so many words in the plans themselves. We treat the LRSD plan as having been so amended.
 
 
 59
 We are mindful also of reservations that have been expressed with respect to PCSSD's plan. It is said that the plan is in conflict with the mandates of this Court, especially those portions of our previous opinions describing the racial percentages that PCSSD schools must attain. We do not believe that there is such a conflict. In the first place, we have carefully refrained from imposing rigid, inflexible numerical requirements. The percentages contained in our last panel opinion discussing the distribution of pupils among PCSSD schools were goals, not rigid quotas, and even these goals were made subject to a 45-minute (one way) cap on busing time. On remand, the parties had an opportunity to examine carefully the practical implications of these requirements. As we have explained above, they reached what amounts to a stipulation that the numerical requirements, if they were applied as rigid quotas, would impose a tremendous burden of busing on black children and would likely not, as a practical matter, materially advance the cause of desegregation.
 
 
 60
 We are bound to respect this factual agreement by the parties. There is no evidence in this record to contradict it, and we must believe that counsel for the Joshua intervenors are the best defenders and guardians of the interests of their own clients. This is, after all, no ordinary litigation. The NAACP Legal Defense and Educational Fund, its lawyers and its predecessors, have vigorously prosecuted this case and its ancestors for more than 30 years. Absent an extremely good reason--and we have been given none--we are reluctant to disregard their judgment as to what is best for their own clients. We conclude that the factual agreement of the parties with respect to school attendance in PCSSD and its practical implications, together with the provisions of the PCSSD settlement plan, are not in conflict with our prior mandate and are not facially unconstitutional.[13]
 
 
 61
 We again remind the parties of the crucial role that continuous monitoring will play. The student-attendance goals of the PCSSD plan have been set out previously in this opinion. Ante at 1378-1379. The stated goal requires "all PCSSD schools [to be] within the range of plus or minus 25 per cent. of the ... district-wide average of blacks by organizational level" prevailing at the end of six years, and that, in any event, no PCSSD school shall have a proportion of black pupils which exceeds the district-wide proportion in LRSD. If this goal is not met, the Joshua intervenors "may apply for implementation of a mandatory reassignment plan in order to achieve a racially balanced school system." 9 App. 2178-79. This provision is not facially unconstitutional. No doubt it gives PCSSD more time to reach the goal than it would otherwise have had, but that is a matter of judgment and degree rather than of constitutional requirement per se. We add that we expect progress towards this goal will be made each year, and we expect the District Court to monitor progress towards this goal continuously during the six-year period. If progress is clearly insufficient, the Joshua intervenors may apply for a modification of the settlement plan. Consent decrees partake of the nature of contracts, as well as of judicial action, and parties seeking to change them bear an extremely heavy burden. They are not, however, immutable in any absolute sense, and extraordinary circumstances can arise that would enable the District Court, within its discretion, to consider modifications. See, e.g., United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932) ("Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.").
 
 
 62
 We add a word about the NLRSD plan. The District Court's opinion rejecting the settlement plans does not specifically criticize its provisions. In view of the fact that the Court had previously approved the plan, with no party filing an appeal from this action, this is hardly surprising. The Court, however, did remark in general that "the parties have failed to come forward with ... a well-planned desegregation proposal. Thus, all are in default." 716 F.Supp. at 1169. If there has been any default on the part of NLRSD, it must have been in the implementation of the previously approved plan, rather than in the plan itself. (We are certain that the District Court did not intend to say that a plan it had previously approved amounted to a default.) If there have been such failures of implementation, they should be addressed, but they are not a sufficient reason to reject the plan as such.
 
 
 63
 It is appropriate at this point to note that the settlement agreement includes compensatory-education funds to be made available to NLRSD. The agreement, 14 App. 3483, provides as follows:
 
 
 64
 Within fifteen days of the final approval of this settlement, the NLRSD will develop a description of the compensatory education programs to be developed with the additional compensatory education funds made available through this settlement and will petition the court to amend NLRSD's plan accordingly. The State, Joshua, and the Districts will support the NLRSD in this effort.
 
 
 65
 In accordance with this provision, NLRSD filed on October 25, 1989, a pleading styled "Stipulated Compensatory Education Programs to be Implemented by North Little Rock School District with Settlement Monies." 14 App. 3584-91. In its order of December 11, 1989, the District Court struck this stipulation from the record. We do not understand the reason for this action. It is important, if not crucial, for NLRSD to have a viable compensatory-education program for its black children. The pleading in question, filed with the agreement of all parties, including the Joshua intervenors, commits NLRSD to such a program in detail. We think it should have been welcomed by the District Court, and the order striking it from the record will be reversed.
 
 
 66
 In sum, our examination of the four settlement plans--the LRSD, PCSSD, NLRSD, and interdistrict plans--convinces us that they are not facially unconstitutional. They are reasonable, good-faith efforts to solve seemingly intractable problems, efforts involving give and take on the part of all concerned, but embodying also significant relief for the plaintiff class. We think it was an abuse of discretion for the District Court not to approve these plans as submitted. If the plans had been approved, the question of appointment of a Metropolitan Supervisor would never have arisen, and the Tri-District Plan would neither have been written nor submitted. The order appointing a Metropolitan Supervisor and commanding the parties to comply with the Tri-District Plan, therefore, necessarily falls along with the order declining to approve the settlement plans submitted by the parties.
 
 
 67
 As indicated above, this does not mean that the parties will be free of supervision or monitoring. Quite the contrary: a necessary condition of our holding that the plans are not facially unconstitutional is that the parties' compliance with them will be carefully monitored. As we shall make clear at the conclusion of this opinion, when we set out the directions to be followed by the District Court on remand, the office previously known as the Office of the Metropolitan Supervisor will be reconstituted as the Office of Desegregation Monitoring, to be headed by a Monitor appointed by the District Court, with such additional personnel as the District Court shall deem appropriate.
 
 III.
 
 68
 We now come to the financial aspects of the case--the settlement agreement providing for payments by the State. As noted above, the District Court refused to approve the agreement as submitted. Instead, it modified the agreement in three respects and then imposed it on the parties, over their objection. (When we say "the parties" in this context, we exclude the State Board of Education. It is agreeable to the three modifications and has asked us to affirm the District Court's order in this respect.) We believe this approach was infirm for substantially the same reasons already given with respect to the settlement plans.
 
 
 69
 A strong public policy favors agreements, and courts should approach them with a presumption in their favor. As the Seventh Circuit said in Armstrong, supra:
 
 
 70
 Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.
 
 
 71
 616 F.2d at 315. In addition, courts are generally without authority to require parties to comply with a "settlement" different from their own agreement. A court may reject a settlement, in proper circumstances, and may indicate what modifications would make the settlement acceptable to it, but it may not require the parties to submit to these modifications. The parties always retain the option to reject the modifications and return to litigation, with all of the risks that this implies. "Of course, the district court may suggest modifications, but ultimately, it must consider the proposal as a whole and as submitted. Approval must then be given or withheld." Officers for Justice v. Civil Service Commission, 688 F.2d 615, 630 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Our holding in Liddell v. Board of Education of St. Louis, 731 F.2d 1294, (8th Cir.1984), is to the same effect: "[T]he settlement agreement and the district court's order will have to be modified to conform to this opinion.... The parties to the settlement agreement are required to decide promptly whether they will accept the changes set forth in this opinion." Id. at 1298.
 
 
 72
 It was therefore error for the District Court to attempt to require the parties to abide by a modified "settlement agreement."[14] Here, because the District Court did not simply reject the settlement, but instead helpfully described the changes needed to make it acceptable, we need not remand for further proceedings. We can simply consider each of the District Court's required modifications and determine whether any of them was necessary to prevent the agreement from being fatally defective. We address each of the three modifications in turn.
 
 1. Interdistrict and Magnet Schools
 
 73
 The District Court agreed that "the State's obligation to contribute to the funding of future interdistrict magnet schools shall be limited by the terms of the settlement agreement," but directed that "there shall be no other limitation on the Court's jurisdiction to order such schools and programs." 726 F.Supp. at 1549. It is important to recall, at this point, the various uses that the phrase "magnet schools" can have. In compliance with the direction in our 1985 en banc opinion, 778 F.2d at 436, the parties stipulated to the creation of six interdistrict magnet schools. The State is required to pay half the necessary capital outlays to establish these schools, and half the cost of educating the students attending them. Each district must contribute towards their operating expenses in appropriate proportions. See 659 F.Supp. at 370. The settlement plans and the settlement agreement contemplate additional interdistrict facilities, to be distinguished from "magnet schools" specifically so called. These interdistrict schools will, it is hoped, attract voluntary transfers because of the excellence and distinctive nature of their programs. They will be, as the parties put it, "generic magnet schools." The settlement plans and the settlement agreement do not purport to limit the District Court's ability to require the creation of such additional interdistrict schools. They limit only how such new schools may be funded. This funding may include payments by the State for majority-to-minority transfers, but it may not include the imposition on the State of a share of the capital costs of these new facilities. We see nothing facially unconstitutional or improper about such an agreement. The agreement does not bar the creation of additional interdistrict schools; it simply provides that, when created, they will not be funded in the same way as the six stipulation magnets.
 
 2. Repair or Replacement of Magnet Schools
 
 74
 The District Court insisted that the settlement agreement be modified to grant it discretion to determine responsibility for repair or replacement of the six stipulation magnets. Assessment of these costs against the State was excluded, but the District Court, according to this modification, would otherwise remain free to provide for necessary repair or replacement of the six stipulation magnets. The controversy over this modification is moot. Appellants have formally stated that they are willing to accept it. Joint Brief for Appellants 150-51. The settlement agreement is therefore deemed amended to incorporate this modification.
 
 3. Use of Settlement Proceeds
 
 75
 The Court directed that settlement proceeds be used only for desegregation purposes. On its face, this condition appears reasonable. If money is being paid to the districts by the State to settle the State's liability for violating the constitutional right to desegregated education, why should not the money be spent only to redress violations of this right? On analysis, however, we believe that this condition is both unnecessary and unwarranted.
 
 
 76
 Under the settlement plans, the districts assume certain unconditional obligations. These obligations are not dependent upon payments by the State. Whether the State makes the payments required by the settlement agreement or not, and whether these payments are adequate to fund the districts' desegregation obligations or not, these obligations remain binding. The compensatory and remedial education programs agreed to by all three districts, for example, are enforceable legal obligations. As a practical matter, given the realities of funding for education, the payments made by the State will have to be used, almost entirely at least, for these purposes--otherwise, the districts would be unable to fulfill their duties. We do not believe that an express condition on the settlement agreement is necessary to secure this end. The parties have made solemn undertakings. We accept these undertakings, again with the reminder that compliance with them will be closely monitored. If the District Court becomes convinced in the future that money is being wasted, and that desegregation obligations contained in the settlement plans are being flouted, it will be fully authorized to take appropriate remedial action. As the parties agree, the settlement agreement implicitly authorizes the District Court to retain jurisdiction to oversee its implementation. See 14 App. 3466.
 
 
 77
 It is also significant that the payments to the three districts are not all attributable to desegregation claims made by LRSD or the Joshua intervenors. The three districts claimed that the State had shortchanged them in terms of customary state aid after the establishment of the six stipulation magnets. They also asserted claims against the State for reimbursement of desegregation expenditures in prior years. In addition, PCSSD had suffered an unforeseen but substantial loss of funds due to the change in district boundaries ordered by this Court in its en banc opinion, a loss which accounts for most, if not all, of a deficit experienced by that district. There is nothing unreasonable about the parties' desire to use a portion of the settlement-agreement payments to cover these claims and losses. The District Court's order, which would have limited future use of settlement-agreement payments to "compensatory and remedial education costs," 726 F.Supp. at 1552, was an abuse of discretion.
 
 
 78
 Again, we stress that we are dealing with a settlement. The payments from the State of Arkansas are to be made voluntarily. If the settlement plans provide a constitutionally accepted level of relief, and we have held that they do, and if the parties' obligation to abide by these plans is unconditional, and we have held that it is, the fact that a portion of the initial payments from the State may go to retire deficits, themselves attributable in the main to the unforeseen consequences of our 1985 en banc ruling, affords no warrant for rejecting the settlement agreement. The agreement ought to have been approved. If it had been approved, there would have been no occasion for the District Court to require that the State's payments go to the Metropolitan Supervisor, instead of directly to the three districts. We again remind the parties, at the risk of being tiresomely repetitious, that the District Court will carefully monitor the payment and use of these funds.
 
 IV.
 
 79
 Under Section V of the settlement agreement, payments were to be made to counsel for the Joshua intervenors for attorneys' fees and litigation expenses. These payments were to go to the NAACP Legal Defense and Educational Fund, Inc. Payments would be made by the State Board of Education ($750,000), LRSD ($2,000,000), PCSSD ($300,000), and NLRSD ($100,000). 14 App. 3468. The State would advance LRSD's share of these payments, and would then deduct $2,000,000 from payments to be made by it to LRSD under Section VI of the settlement agreement during the last two years of the payment schedule set out in the agreement (1997-1999). The settlement agreement contained the following explanatory statement:
 
 
 80
 The parties are satisfied that over the thirty-three years of this Litigation, Joshua and its predecessor parties, all of whom have been represented by attorneys for the LDF, have expended time and incurred costs for which they have not been compensated. The parties are also satisfied, upon a review of their own time records and costs in this Litigation over the last five years, that the payment is fair and reasonable and consistent with the payments made over that period of time to counsel for the other parties. The parties also agree for purposes of this settlement that Joshua is a prevailing party for purposes of relief.
 
 
 81
 14 App. 3469.
 
 
 82
 The District Court approved the portion of the agreement calling for a direct payment by the State of $750,000. 726 F.Supp. at 1555. Because NLRSD had already paid its $100,000 share, the District Court treated this aspect of the agreement as moot. Ibid. The other fees contemplated by the agreement were disallowed. The Court gave several reasons for this action.
 
 
 83
 1. LRSD and PCSSD, the Court thought, were prevailing parties and should therefore not have to pay any fees. LRSD was the original named plaintiff in this case and had secured a substantial measure of interdistrict relief. Both LRSD and PCSSD also prevailed on a cross-claim against the State. Ibid.
 
 
 84
 2. The amounts to be paid are excessive. Id. at 1554, 1555.
 
 
 85
 3. "No substantiating documents or time records were filed in support of this enormous claim for attorney fees." Id. at 1554-55.
 
 
 86
 4. Fees are to be paid for various predecessor cases, including Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), and "[o]f the two principal attorneys in that case, one [Wiley Branton, Sr.] is deceased and the other [The Hon. Thurgood Marshall] is an Associate Justice of the Supreme Court of the United States." Id. at 1554.
 
 
 87
 5. The effect of the $2,000,000 payment by the State on behalf of LRSD "would be to reduce by two million dollars the funds available to the black children of the LRSD for compensatory and remedial education." Id. at 1555.
 
 
 88
 We are mindful of the limited scope of our review. We are dealing, as before, with a settlement agreement, and such agreements are presumptively valid. Courts, however, have broad inherent supervisory powers over attorneys practicing before them. They may inquire into the fees charged by lawyers and regulate or curtail them if necessary to protect clients from imposition or to prevent otherwise unconscionable behavior. E.g., Coffelt v. Shell, 577 F.2d 30, 32 (8th Cir.1978). This is especially true in class actions and cases involving plaintiffs who are minors. We review the District Court's action for abuse of discretion only. We ask whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment. See Kern v. TXO Production, Inc., 738 F.2d 968, 970 (8th Cir.1984). In addition, we may inquire whether the District Court committed any errors of law (as to which our review is de novo ).
 
 
 89
 We address in turn each of the reasons given by the District Court.
 
 
 90
 1. The Court said that LRSD and PCSSD, as prevailing parties, ought not be required to pay lawyers' fees. This reasoning is erroneous as a matter of law. With respect to LRSD, the precise issue has already been determined by this Court. In Little Rock School District v. Pulaski County Special School District, 787 F.2d 372 (8th Cir.1986) (per curiam) (en banc), fees were awarded to counsel for the Joshua intervenors for certain appellate proceedings, and the award was made against LRSD and PCSSD, among other parties. One member of the Court (as it happens, the writer of this opinion) dissented, arguing that "LRSD, ... like the intervenors, is a prevailing party on the merits.... I do not understand why one prevailing party should pay a portion of the fees and costs incurred by another prevailing party." Id. at 374 (Arnold, J., concurring in part and dissenting in part). The Court rejected this view.
 
 
 91
 Thus, this Court en banc has decided that LRSD is not a prevailing party, at least so far as fee awards in favor of Joshua and against it are concerned. However much the District Court and the writer of this opinion might disagree with this holding, both of us are bound by it, and so is this panel. It is the law of the case. Accord, Little Rock School District v. Pulaski County Special School District, Nos. 87-1404 et al. (8th Cir. June 29, 1988), Order at 3 (Arnold, J., concurring). The same reasoning applies to PCSSD, against whom this Court en banc awarded fees in favor of counsel for the Joshua intervenors in 1986.
 
 
 92
 It has to be significant, moreover, that neither LRSD nor PCSSD is objecting to these payments. On the contrary, they have applied to the District Court to approve them. That LRSD and PCSSD may be prevailing parties with respect to their cross-claim against the State is not material for present purposes. The question is whether they are prevailing parties as against the Joshua intervenors, and this Court has held that they are not.
 
 
 93
 2. It is said that the amounts to be paid are excessive. Certainly the amounts are large. By way of explanation, a reference to the manner in which they were computed by the parties is appropriate. Cooper v. Aaron, supra, the grandparent of this case, was instituted in 1956. Desegregation matters have been litigated almost continuously over the next 34 years. The results are substantial. If they are to be expressed only in monetary terms, a package of benefits worth more than $100,000,000 has been obtained, to say nothing of substantial non-monetary injunctive relief, past, present, and future. The State and the three school districts did not believe that the fees agreed on were excessive when viewed in this context, and neither do we. The fees are amply justified by the level of benefits obtained, and the efforts of counsel were indispensable to this measure of success. Lawyer-bashing is popular in some quarters, and some lawyers deserve criticism, but the efforts of counsel in this case are worthy of substantial recognition. As the District Court remarked in another case involving the award of counsel fees (with apologies to St. Paul), "[w]ere it not for the efforts of the attorneys, there would be no fund to dispute. Thou shalt not muzzle the ox that treadeth out the corn." Equifax, Inc. v. Luster, 463 F.Supp. 352, 358 (E.D.Ark.1978), aff'd per curiam, 604 F.2d 31 (8th Cir.1979), cert. denied, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980).
 
 
 94
 3. The District Court remarked on the absence of "substantiating documents or time records." 726 F.Supp. at 1554. If this were a fee request being resisted by the losing parties, this comment would be highly relevant, if not dispositive. Contested fee requests must be carefully supported by documentation, including time records. These fees, however, were agreed to by all parties. The Special Master's report did not recommend disapproval of the fee provisions of the settlement agreement and did not request documentation. Nor did the District Court request such documentation or remark on its absence until the entry of its order disapproving the fee provisions of the settlement agreement. If the parties had been given appropriate notice of the importance of this point in the Court's mind, we are confident that they could have provided reasonable estimates of the time spent sufficient to justify the proposed agreement. In fact, the record contains a sketch of such an estimate. 12 App. 2879-81.
 
 
 95
 4. The Court noted that the fees agreed to included work done in litigation long since terminated. It is perfectly true that the present case began in 1982. If this were a contested fee request, there could in all likelihood be no award made for work done in predecessor cases, especially cases that were closed before 1976, the effective date of the Civil Rights Attorneys' Fees Awards Act, 42 U.S.C. Sec. 1988. We stress again that this is not a contested case, and that it was not inappropriate for the parties, in determining the amount of fees to be agreed upon, to take into account an estimate of work performed in related litigation.
 
 
 96
 It is true, as the District Court noted, that the Hon. Thurgood Marshall, now an Associate Justice of the Supreme Court of the United States, and Wiley Branton, Sr., Esq., now deceased, did some of the work in the predecessor litigation. As to Justice Marshall, it was never intended that any of the agreed-upon payments go to him, and the fees agreed to did not include any time or services performed by him. 16 App. 4213. And as to Mr. Branton, he did, before his death, consult with counsel for the Joshua intervenors in this case, and his estate will properly share, to the extent appropriate, in the fees paid. (Under the agreement, the NAACP Legal Defense and Educational Fund, Inc., is to distribute the payment among the various counsel, past and present, in proper proportions.)
 
 
 97
 5. Perhaps the most serious charge made by the District Court is that the $2,000,000 to be paid by the State on behalf of LRSD is a direct detriment to the black children on whose behalf this litigation has been prosecuted. We respectfully disagree with this reasoning. In the first place, there will be no dollar-for-dollar reduction of funds otherwise available to the black children of LRSD for compensatory and remedial education. The $2,000,000 to be paid in fees by LRSD will be advanced by the State at once. The repayment by LRSD to the State will not begin until 1997. Thus, what LRSD is losing, if it can be said to be losing anything at all, is only the present value of $2,000,000 to be paid seven years hence. Secondly, and perhaps more fundamentally, we see nothing inherently objectionable about the proposition that relief otherwise available to the plaintiff class will be lessened on account of the necessity of compensating its lawyers. The lawyers are worthy of their hire. They have performed diligently and well, and there is nothing wrong with compensating them out of a fund which their labors have helped to create.
 
 
 98
 In sum, we conclude that the District Court erred as a matter of law and abused its discretion in disapproving the fee portions of the settlement. The amount is large, but there is nothing unethical or unconscionable about it. That portion of the order of December 11, 1989, disapproving the fee payments in part must be reversed.
 
 V.
 
 99
 To summarize: the parties have agreed to settle this case. Settlements are presumed to be acceptable and valid, and there was no sufficient reason for this settlement, either the plans or the financial agreement, to be disapproved. Accordingly, the Metropolitan Supervisor, who came on the scene only as a consequence of the disapproval of the settlement, should never have been appointed, and the Tri-District Plan, prepared by the Metropolitan Supervisor, should not have been allowed to supplant the parties' settlement plans.[15]
 
 
 100
 We have taken a different view from that of the District Court in several respects. This should not obscure the significant contributions that the District Court, in the person of the Hon. Henry Woods and Aubrey McCutcheon, Esq., the Special Master, have made to the cause of quality desegregated education in Pulaski County, Arkansas. They have worked towards this end with zeal and devotion, Judge Woods (who has now withdrawn from the case) for the better part of a decade. We respect their efforts, intentions, and accomplishments.
 
 
 101
 The action we take today can lead to a period of calm in this case, perhaps even bringing the parties a happy issue out of all their afflictions. Whether this will occur rests largely in the parties' hands. If they scrupulously and diligently carry out the settlement plans and the settlement agreement, and if there is no major unforeseen change in circumstances, they should be able to devote more energy to education, and less to litigation.
 
 
 102
 We take the following actions in these appeals:
 
 
 103
 1. In Nos. 89-2288, 89-2289, 89-2352, and 89-2353, the District Court's order of June 27, 1989, disapproving the settlement plans, is reversed.
 
 
 104
 2. No. 89-2354, heretofore held in abeyance at the request of the parties, is dismissed as moot.
 
 
 105
 3. On remand, the District Court is directed to approve the settlement plans submitted by the parties.
 
 
 106
 4. The District Court is also directed to vacate its order creating the Office of Metropolitan Supervisor. This office is to be replaced by an Office of Desegregation Monitoring, to be staffed by a Monitor and such additional personnel as the District Court may deem appropriate, its funding and budget to be within the control of that Court.
 
 
 107
 5. In Nos. 90-1165, 90-1166, and 90-1167, the District Court's order of December 11, 1989, is reversed, and the order of December 15, 1989, is vacated, with instructions to enter a fresh order dismissing the State as a party pursuant to the terms of the parties' settlement agreement.
 
 
 108
 6. On remand, the District Court is directed to approve the parties' settlement agreement as written by them.
 
 
 109
 7. In Nos. 90-1579 and 90-1580, the order of March 5, 1990, directing the parties to carry out the Tri-District Plan, is reversed.
 
 
 110
 8. The District Court is instructed to monitor closely the compliance of the parties with the settlement plans and the settlement agreement, to take whatever action is appropriate, in its discretion, to ensure compliance with the plans and the agreement, and otherwise to proceed as the law and the facts require.
 
 
 111
 9. The parties have been proceeding during this school year under the terms of our interim order filed on July 2, 1990. It may be necessary, in order to make a smooth transition, for the details of the settlement plans to be adjusted to produce an appropriate fit between their future application and existing circumstances. The parties should be able to agree as to whether any such adjustments are necessary, and, if so, what they should be. Absent such agreement, the District Court is authorized to take such action as may be just.
 
 
 112
 It is so ordered.
 
 
 
 [1]
 The State, as such, is not a party to this lawsuit, but the Arkansas State Board of Education, an arm of the State, is a named defendant. For ease of reference, we shall refer to that entity as the State of Arkansas
 
 
 [2]
 Some have characterized our decision as holding that consolidation was forbidden. This is a misunderstanding of the nature of this lawsuit. Consolidation may be, in terms of educational quality and racial fairness, a good thing. It is unquestionably permissible, given the proper circumstances, under state law. And the General Assembly, if it saw fit, could require consolidation, or relax the state-law requirements for achieving it. Nothing we have said or held is inconsistent with these propositions. We have held only that the Constitution does not compel consolidation. What the parties might choose to do of their own volition is, in general, their own business
 
 
 [3]
 Bayou Meto Elementary School, situated in a remote location, was expressly excepted from these requirements. See 839 F.2d at 1305 n. 12
 
 
 [4]
 This citation is to the Appellants' Joint Appendix
 
 
 [5]
 One elementary school, Romine, would be an interdistrict school. 10 App. 2229
 
 
 [6]
 Enrollment goals, seat allocations, and funding mechanisms for these schools were approved by the District Court on February 27, 1987. 659 F.Supp. 363. No appeal was taken from this ruling
 
 
 [7]
 In addition to these six interdistrict schools, the Interdistrict Plan provided that future interdistrict schools "in or near Chenal Valley and the Scipio A. Jones site" may be considered. 8 App. 1721
 
 
 [8]
 In referring to the settlement agreement in this opinion, we mean the final version of the agreement presented to the Special Master on September 28, 1989. 14 App. 3443-500
 
 
 [9]
 On June 27, 1989, before the submission of the final form of the settlement agreement, the District Court entered an order which, among other things, resolved a dispute between the three districts and the State Board of Education with respect to state minimum-foundation aid. The subject matter of this dispute is, as noted in text, covered in the settlement agreement, as later submitted. One of the appeals before us, No. 89-2354, is the appeal of the State Board of Education from this aspect of the order of June 27, 1989. On February 1, 1990, on joint motion of the parties, we directed that this appeal be held in abeyance. The parties agree that it will be moot if the settlement agreement is ultimately approved
 
 
 [10]
 Federal courts, of course, have the power to rule on questions of state law, including questions arising under state constitutions and the rules of state legislatures. When these questions are doubtful, however, it is often the better part of wisdom for federal courts to abstain, leaving them for state courts to resolve authoritatively. Only the state courts have power to decide such issues with ultimate binding authority. We believe the District Court acted wisely, in June of 1989, in refusing to enter the state-law thicket that surrounded the purported passage of the act funding the settlement agreement. As we shall recount later in this opinion, subsequent action by the General Assembly has removed any doubt as to the state-law authorization for the agreement
 
 
 [11]
 The Joshua intervenors appealed the order of December 11, 1989, only in their capacity as representatives of patrons and children of PCSSD and NLRSD. They did not appeal in their capacity as representatives of patrons and children of LRSD. Neither did LRSD itself appeal from this order. The District Court had made clear to LRSD that it could not draw upon any of the funds provided for it by the settlement agreement if it filed an appeal from the order of the District Court approving the settlement with modifications. See 17 App. 4593
 
 
 [12]
 Like the appeal in No. 90-1165, the Joshua intervenors' appeal in No. 90-1580 involves only their status as representatives of patrons and children of PCSSD and NLRSD
 
 
 [13]
 We note that the Special Master himself suggested raising the maximum black enrollment percentage guideline established by us to 42 per cent. "in order to prevent an unacceptable busing burden." 716 F.Supp. at 1196
 
 
 [14]
 Perhaps because it recognized this principle, the District Court held that the parties had waived what would normally be their right to object to modifications of their settlement. It said: "The parties agreed, on the record, in open court, that the settlement would be binding, even if ... clarifications and guarantees were added, except that certain provisions were identified by the parties as unchangeable." 726 F.Supp. at 1551. We respectfully disagree with this reading of the record. The parties never waived their right to object to substantive modifications of their agreement. What they said was something quite different: that if differences of opinion as to the meaning of the settlement agreement arose in the future, they could be authoritatively resolved by the courts. See 13 App. 3153-56, 3161. We hold, therefore, that the parties did not waive their right to object to modifications of the substance of the agreement
 
 
 [15]
 We do not mean to imply that Mr. Reville's labors were all necessarily in vain. The parties may conclude that the Tri-District Plan contains useful ideas. They are free, by agreement, to modify the settlement plans by incorporating in them one or more provisions of the Tri-District Plan, subject, of course, to the approval of the District Court